STATE OF CONNECTICUT *vs.* JOHN PALM.

MALTBIE, C. J., HINMAN, AVERY, BROWN and JENNINGS, Js.

Argued January 6th—decided February 1st, 1938.

*William M. Harney,* for the appellant (defendant).

*Samuel E. Hoyt,* State's Attorney, with whom was *Abraham S. Ullman,* Assistant State's Attorney, for the appellee (the State).

AVERY, J. The accused was charged with murder in the first degree in having shot to death while attempting to perpetrate the crime of robbery, Peter W. Kaminski, at Milford, on October 3d, 1936. He pleaded not guilty and elected to be tried by the court instead of by the jury. The court after trial found him guilty of murder in the first degree as charged and the accused has appealed. In accordance with our practice, the trial court has made a finding of the subordinate facts upon which it based its conclusion that the accused was guilty as charged. *State* v. *Frost,* 105 Conn. 326, 330, 135 Atl. 446; *State* v. *Guilfoyle,*

109 Conn. 124, 126, 145 Atl. 761. The finding is in considerable detail and in this appeal the accused seeks numerous corrections and additions to the finding for the purpose of destroying the basis upon which the court's ultimate conclusion was founded. The accused also has brought up for review certain rulings of the court made in the course of the trial and he also raises the general question whether upon the evidence he could be found guilty beyond a reasonable doubt.

Among the facts found by the trial court are these: On October 3d, 1936, at about 1.30 o'clock in the morning, Peter Kaminski was seated in the driver's seat on the left-hand side of an automobile which was parked at a place known as Gulf Beach in the town of Milford. Seated in the car next to Kaminski and upon his right was Lillian Del Grego and upon the back seat directly behind Kaminski was seated Neta Shaw and upon her right John Miller. Kaminski was a deputy sheriff in New Haven County and Miller was a court messenger. On the morning of October 2d, the uncontested divorce case of Lillian Del Grego against Joseph Del Grego was heard and Miss Shaw was a witness. While the two women were in the court room Kaminski struck up an acquaintance with them and made an appointment to take them out that evening. Gulf Beach is on Gulf Street which runs southerly from New Haven Avenue and along the waterfront. The car was parked on the beach about one thousand feet west of a brick refreshment stand located on the sand. Other cars were parked east of the stand but none other than that of Kaminski west of it. The car was facing the water, the moon was full and the surrounding territory was light. There was an electric light on a pole near where the car was parked and to the rear of it. After Ka-

minski's car had remained on the beach for some considerable time a light-colored car drove up and stopped directly in back of it. The car was observed by Miss Shaw and Miller upon the back seat who thought it was a police car of the town of Milford. A man got out and came over to the Kaminski car and opened the two doors on the left side. He was dressed in gray clothing, a gray cap, and had a handkerchief covering his face from the bridge of the nose downward. The cap was subsequently found in the home of the accused.

On approaching the Kaminski car the man said, in substance, "Stick them up. This is a stick-up and I'm not fooling." At that time he stood at the left front door in front of and very near to Kaminski. As he approached the car he had a gun in his right hand and pointed it at Kaminski. The man then further said, "Hand over your pocketbook." Kaminski replied, "You don't know who you are fooling with, I am a deputy sheriff," and drew his badge from his pocket. As he did so the man shot Kaminski. The man then came to the back seat and pointed the gun at Miss Shaw and Miller and said, "There is more where that came from," and they handed him their pocketbooks. The wind blew the mask so that part of his face was seen by the two women in Kaminski's car. They also had a view of a large part of the man and noted his distinct eyes, sloping right shoulder and the tone of his voice. Subsequently they saw the accused in a line-up in the Mount Vernon, New York, police station, and identified him as the man who shot Kaminski. The latter was taken to the hospital at Milford immediately after the shooting but was dead before he arrived.

The evidence before the judges was ample to justify them in finding that a robbery was committed and

that Kaminski was killed while the robber was attempting to perpetrate that crime and that the robber was guilty of murder in the first degree as charged in the indictment. General Statutes, § 6043. Indeed, upon this appeal it is not seriously contended that the crime charged was not committed by someone. The claim of the accused is that the identity of the accused as the robber who did the shooting was not established beyond a reasonable doubt. Of the three persons who were with Kaminski at the time he was shot, the two women were positive at the trial in their identification of the accused as the assassin. Their evidence, even in the printed record, is direct, positive, and certain as to the identity of the accused with the assassin. In the course of their examination they testified in great detail of what occurred that night, described the robbery and told how they picked out the accused some months afterward from among a number of prisoners whom they saw at Mount Vernon, New York. They were subjected at the trial to a most searching cross-examination and their evidence was not shaken or weakened in any material respect. The testimony of Miller in no essential respect differed from the testimony of the two women, except that he was not positive as to the identity of the accused as the assassin, although he stated that the voice of the accused which he had heard in the court room resembled the voice of the assassin.

In addition to the facts established by direct evidence to which we have referred, there were circumstances in the evidence of the State which tended to confirm the proof of the guilt of the accused. While the accused was in Milford his mother, Mrs. Gove, owned a Dodge four-door sedan, light bronze in color. Subsequent to the shooting, the car owned by Mrs. Gove was seen, on February 12th, 1937, in a garage

in Mount Vernon, New York, where the accused lived, and, a few days later, was removed to a garage in Yonkers, New York, and it was there found and identified by the witnesses, Del Grego and Shaw, as the car that stood in back of the Kaminski car on Gulf Beach and from which the accused had come prior to the shooting.

The accused was twenty-five years of age. On May 15th, 1936, he was released on parole from Sing Sing Prison, to which he had been sentenced for the crime of attempt at robbery, being paroled to the custody of his mother, conditioned on his living with her at Milford. From that date until November 23d, 1936, he resided on Thompson Street, Milford, in a house owned by his mother about two miles and a half from the place where the homicide occurred. Adjacent to the house occupied by the accused with his mother was the home of Mr. and Mrs. Ward D. Pease and their son, James. The car belonging to Mrs. Gove was frequently driven by the accused and was usually kept in a driveway between the home of the accused and the house next door. On the morning of October 3d, this car was seen by the Pease family parked in the rear of the Gove house out of sight of the highway. Gulf Street intersected New Haven Avenue at a point about one-half mile from the beach where the homicide occurred. On October 3d, at 1.30 or 1.35 in the morning, a light-colored car was seen driving westerly on New Haven Avenue, coming from the point where it is intersected by Gulf Street. This car had a spare tire on the fender well and on the right side were dual tail-lights, and a trunk carrier or a luggage carrier in the rear, as did the car of Mrs. Gove.

On the day the accused was presented in court at Mount Vernon he waived extradition and was brought

back to New Haven by police officers. While return-
ing with the officers he stated to them, "You know I
was in the town of Milford the night of the shooting
affair at Gulf Beach. The next day I heard reports
on the radio. Do you know I fit that description all
but half an inch in height and that my car answered
the description and that I laid low for one week."
He was then asked by the officer, "Well, if it wasn't
you, why didn't you give yourself up to the chief of
police in Milford?" To which he replied, "Well, my
record is bad and they would hold it against me."
The accused testified before the coroner of New
Haven County that he heard of the murder on the
radio or read of it in the newspapers and stated, in
response to the question of the coroner, "What did
that mean to you?" as follows: "It meant to me.
There is me. I am an ex-convict. It would be a nice
thing if I happened to get picked up for it, because
those things do happen."

The accused claimed an alibi. In June, 1936, he
met Ruth Schumann, seventeen years of age, who
was employed by and lived with Mrs. Lentz in Mil-
ford. After their first meeting he saw her on some
part of nearly every day or evening until she left
Milford the latter part of October. Frequently she
went riding with him and his mother, visited at the
Gove home, and walked with him upon the beach.
At the trial she testified that on the evening of
October 2d, the accused walked to the Capitol Theater
in Milford with her and she went in to the perform-
ance; that she entered the theater a quarter before
8 o'clock and remained there until 10 o'clock; that
thereafter she met the accused on the green in his
mother's car and that they then went to his mother's
house and remained there with his mother and a
friend of hers, May Brody, until 12 o'clock; that they

left his mother's house at that time and went down to a beach in Milford and remained on the beach until 1 o'clock, and from there they walked to the house where she was employed and remained upon the steps of the house in conversation until 3 o'clock the following morning. The accused testified to the same effect, and the mother of the accused, Mrs. Gove, corroborated the witness' story to the effect that the accused and the witness were at her house that night and left about 12 o'clock. The State produced evidence of statements made by Miss Schumann inconsistent with her statements upon the witness stand.

On the whole case it is clear that the judges who composed the trial court were satisfied with the identification of the accused as the perpetrator of the crime and did not credit the testimony as to an alibi produced on behalf of the accused. The counsel in this appeal have asked numerous corrections of the finding and additions thereto. To attempt to discuss all of these requested corrections would extend this opinion to unreasonable length and serve no useful purpose. There is abundant evidence in the record to justify the trial court in finding the facts to which we have referred. The crucial question in the case was the identity of the accused with the assassin. In addition to the other evidence, this was established by the testimony of two of the eye-witnesses who testified directly, positively, and without any qualification to that effect. No correction of the finding is permissible by which the position of the accused would be materially advantaged. To warrant conviction of a crime punishable by death, our statute requires the testimony of two witnesses or that which is equivalent thereto. General Statutes, § 6479; *State* v. *Schutte,* 97 Conn. 462, 467, 117 Atl. 508; *State* v. *Palko,* 122 Conn. 529, 533, 191 Atl. 320. The trial

judges had before them evidence in the amount required by the statute. They saw the witnesses, observed their manner of testifying, observed the accused, heard his voice, and had opportunities for weighing and evaluating the testimony not afforded to a reviewing court. As the evidence was amply sufficient to sustain the finding of guilt, this court will not attempt to substitute its judgment on a pure question of fact for the judgment of the trial court. *Masi* v. *General Ice Cream Corp.*, 120 Conn. 259, 262, 180 Atl. 455; *Genishevsky* v. *Fishbone,* 109 Conn. 58, 62, 145 Atl. 54; *Schroeder* v. *Hartford,* 104 Conn. 334, 337, 132 Atl. 901.

It remains to consider certain rulings of the court which are assigned as error. Upon motion of counsel for the accused the trial court directed that all the State's witnesses upon the subject of identification be excluded from the court room; and this was done. After one of the witnesses had testified, defendant's counsel moved that the witness be excluded from sitting in the court room on the ground that the witness might be called in rebuttal. This motion was denied and the accused excepted. In the course of the trial counsel for the accused stated to the court that Joseph Del Grego, a defense witness, the former husband of Lillian Del Grego, a state's witness, had been asked by the sheriff, acting under instructions from the state's attorney, to sit in a certain part of the court room, and counsel for the accused asked that the witness be permitted to sit where seats were available when he entered; whereupon the court ruled that the seat then occupied by the witness was a proper place for him to be and that the fact that the state's attorney had instructed that he be placed there was merely incidental. The court stated: "In fairness of conducting the trial, . . . the court feels that it is just

as well that he does not sit where he sat yesterday." The exceptions taken to these rulings are without merit. In regard to the first ruling, the majority of courts hold that sequestration of witnesses rests in the discretion of the trial court. *Commonwealth* v. *Follansbee*, 155 Mass. 274, 277, 29 N. E. 471; *Commonwealth* v. *Thompson*, 159 Mass. 56, 58, 133 N. E. 1111; 3 Wigmore, Evidence (2d Ed.) § 1839. Moreover, it does not appear that the witness was called in rebuttal and the ruling therefore could not have harmed the accused. In regard to the second ruling complained of, it is the province of the trial court to control the proceedings in the court room and such reasonable arrangements as may be made by it in the exercise of its judgment do not constitute grounds upon which to predicate reversible error. In the instant case there is nothing in the record to suggest that there was any improper exercise of its discretion by the trial court or that any harm was suffered by the accused in consequence of either of the rulings complained of.

Leah A. Pease was called by the State and asked whether at some time or other she had noticed anything unusual with respect to the departure or return of the Gove car. This question was objected to as leading and admitted by the court over exception. Having answered that there was one night when she remembered the car going out late in the evening, she was then asked whether from her recollection from a certain conversation she could tell what day of the week she thought it was, and, over objection, she was permitted to answer, and stated that she thought it must have been the last of the week. There was no error in these rulings. The first question was not leading, nor was it improper to allow the witness to refresh her recollection by reference to a

conversation. She was then asked whether at some period she had noticed anything unusual about the position of the shades in the Gove home. It does not appear that this question was answered.

Ruth Schumann, a witness for the defense, had testified on direct examination that she had been in the company of the accused from a quarter to ten on the night of October 2d until about 3 o'clock on the morning of October 3d. On cross-examination she was asked whether or not she had been on Fort Trumbull Beach on the afternoon of October 3d, and had seen a man named Gadd and a girl named Porter and had stated to either or both that she couldn't say where John Palm was the night before because he hadn't shown up. She denied making these statements. Thereafter the accused introduced as a witness on his direct case, Parmelia Des Marchais, an acquaintance of Miss Schumann. She stated that Miss Schumann was at her home on the afternoon of October 3d and had a conversation with the witness in the presence of the mother, sister and grandfather of the witness, and Miss Des Marchais was then asked the following question: "Whether or not during that conversation you learned where Ruth had been the night before." After objection and being warned not to answer until the court had ruled, she was then asked, "Did the conversation which you had with Ruth Schumann on the afternoon of October 3d, 1936, at your house have to do with the whereabouts of herself and John Palm on the night of October 2d?" This question was objected to by the State and excluded by the court. This ruling was correct at the time it was made, as it does not appear that any evidence then had been offered of a prior inconsistent statement by Miss Schumann. She had been asked if she had made such statements and had denied doing

so. There is eminent authority for the view that under some circumstances it may be within the discretion of the trial court to permit evidence of prior consistent statements to be given to rebut testimony tending to show an inconsistent statement. *Stewart v. People*, 23 Mich. 63, 74; 2 Wigmore, Evidence (2d Ed.) § 1126. Where no other element appears in the situation except that a consistent statement is sought to be shown in order to sustain the credit of a witness attempted to be attacked by showing an inconsistent statement out of court, the reason for admitting the consistent statement is to throw doubt upon the evidence of the witness who has testified to the inconsistent statement. *Stewart v. People*, supra; 2 Wigmore, Op. Cit., § 1126. That being so, evidence of the prior consistent statement has no place in the case until testimony as to a prior inconsistent statement has been offered. *Lyke v. Lehigh Valley R. Co.*, 236 Pa. St. 38, 48, 84 Atl. 595. At the stage of the case when the evidence in question was offered, all there was in the case was the denial of Miss Schumann that she had made an inconsistent statement, and the evidence, if admissible at all, was not proper at that time.

Upon the whole record we are satisfied that the accused had a fair trial and that there was evidence before the trial judges sufficient to warrant their conclusion that the accused was guilty of the crime charged beyond a reasonable doubt and that there is no ground for interference with the judgment by this court.

There is no error.

In this opinion the other judges concurred.