## STATE OF CONNECTICUT *v.* ROBERT J. McCARTHY

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued May 1—decision released September 4, 1979

*Arthur Levy, Jr.,* and *Warren A. Luedecker,* with whom was *Steven A. Levy,* for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Domenick J. Galluzzo,* assistant state's attorney, for the appellee (state).

LOISELLE, J. The defendant was indicted for the murder of Victoria Stuart in violation of General Statutes §§ 53a-54a and 53a-8, and informed against for the attempted murder of Donald Stuart in violation of General Statutes §§ 53a-54a and 53a-49. The defendant was found guilty of both charges by a jury. He has appealed from the judgments rendered on the guilty verdicts.

The jury could have found the following: The defendant first met Jean Siretz, then age 17, in October, 1973, and they lived together from February, 1974, through April, 1975. At about 8:30 p.m. on April 4, 1975, they went to a Norwalk bar. Before going to the bar, Siretz snorted cocaine and there was testimony that she was high on LSD. When she and the defendant left the bar, they discovered that the windshield of the defendant's van had been smashed. The defendant assumed that Donald Stuart had done it. Stuart had previously bought drugs from the defendant for sale to others. Siretz and the defendant then went to a nearby bowling alley where Donald Stuart's car was parked and the defendant smashed Stuart's windshield with a tire iron.

They then went to the apartment of Donald Lawlor. It was about 12:45 a.m. on April 5, 1975. They were both very angry because they thought Donald Stuart had vandalized the defendant's van. The defendant told Lawlor that they would get Donald Stuart for that. The defendant and Siretz insisted that Lawlor return a gun they had left with Lawlor. Siretz acted out a pantomime depicting how she would "blow Donald Stuart away." The defendant and Siretz asked Lawlor what the perfect alibi would be. He suggested checking into a hospital. The defendant and Siretz said they were going to "blow . . . Stuart away." While still at Donald Lawlor's apartment, the defendant asked Siretz if she knew how to fire a gun. When she answered "yes," he pointed to his head, between his eyes, and told her to shoot both Donald Stuart and his wife Victoria there to make sure they were dead. The defendant told her to leave the gun under a washing machine at a friend's building after she

shot them and to meet him at the Norwalk Hospital. The defendant's plan was to go to the emergency room, complaining of a lower back injury, while Siretz went to the Stuarts' apartment. The defendant loaded the gun and gave it to Siretz. The defendant told Siretz that he could not shoot Stuart because the defendant was already in enough trouble in New York because he had shot his wife. The defendant drove Siretz to the parking lot of the Stuarts' apartment building and left her there. At about 2 a. m. on April 5, 1975, Siretz knocked on the door of Donald and Victoria Stuart's third floor apartment. Victoria Stuart let her in. After asking Victoria where Donald was, Siretz walked into the bedroom and shot him. Victoria Stuart ran out of the apartment, but Siretz dragged her back inside and shot and killed her. After Siretz hid the gun under a washing machine, she met the defendant, Robert McCarthy, at the Norwalk Hospital where she told him she had "done it" and he said "he was sort of proud." When the police arrived at the Stuarts' apartment, they found Victoria Stuart dead and Donald Stuart suffering from a bullet wound which mutilated his face and caused the loss of his right eye.

The defendant's first assignment of error is that the trial court erred in denying his motion to dismiss based on the state's failure to provide him with a speedy trial.[1] The defendant was arrested and incarcerated on April 5, 1975. His first trial, which ended

---

[1] Although the denial of a motion to dismiss is ordinarily not assignable as error; *State* v. *Peay*, 165 Conn. 374, 375, 335 A.2d 296 (1973); the defendant's claim will be discussed because it involves a fundamental constitutional right. *Klopfer* v. *North Carolina*, 386 U.S. 213, 223–26, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967); see *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973).

in a mistrial, started on November 3, 1976. The retrial at which he was convicted began on January 11, 1977. Eighteen months and twenty-eight days elapsed between the time when the defendant was arrested and when he was first brought to trial.

The sixth amendment guarantee of a speedy trial is a fundamental right applicable to the states through the fourteenth amendment. *Klopfer* v. *North Carolina,* 386 U.S. 213, 223, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967). The Connecticut constitution, article first, § 8, provides a comparable safeguard. Although the right to a speedy trial is fundamental, it is necessarily relative, since a requirement of unreasonable speed would have an adverse impact on both the accused and society. *United States* v. *Ewell,* 383 U.S. 116, 120, 86 S. Ct. 773, 15 L. Ed. 2d 627 (1966); *Beavers* v. *Haubert,* 198 U.S. 77, 87, 25 S. Ct. 573, 49 L. Ed. 950 (1905). In *Barker* v. *Wingo,* 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court found "no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days of months." Id., 523. Instead it adopted a balancing test, which would require that each case be approached on an ad hoc basis. The court identified four factors which should be assessed in determining whether a particular defendant has been denied this right: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id., 530; *State* v. *L'Heureux,* 166 Conn. 312, 319, 348 A.2d 578 (1974); see *Moore* v. *Arizona,* 414 U.S. 25, 94 S. Ct. 188, 38 L. Ed. 2d 183 (1973). The defendant's claim that he was denied his constitutional right to a speedy trial must be examined in light of those factors.

The defendant's brief, which refers to the court file and which is not contradicted by the state, outlines the chronology of the activity of the defendant's case.[2] The record indicates that almost nineteen months elapsed from the time of the arrest to

[2] 4/22/75 — Bench warrant issued. Bond $200,000.

4/23/75 — Bench warrant returned. Advice of rights.

4/23/75 — Bond review - continued on same bond of $200,000.

4/24/75 — Motion for bill of particulars filed.

4/24/75 — Motion for discovery filed.

5/2/75 — Motion for bill of particulars and motion for discovery partially granted.

6/4/75 — Motion for separate grand jury proceedings filed and denied.

6/9/75 — Motion addressed to grand jury proceedings filed and denied.

6/9/75 — True bill returned by grand jury; case continued for plea to 6/11/75.

6/11/75 — Arraignment continued to 6/13/75 to permit appearance by special public defender.

6/11/75 — Bill of particulars filed.

6/11/75 — Disclosure filed.

6/11/75 — Attorney Joseph Brophy appointed special public defender.

6/13/75 — Plea to first count - pleaded not guilty - election: jury of 12 - date: 7/10/75.

6/13/75 — Bond review continued on same bond of $200,000 without prejudice.

7/8/75 — Motion to quash the indictment.

8/13/75 — Motion to quash the indictment denied.

8/28/75 — Motion for speedy trial filed.

9/16/75 — Motion for speedy trial denied.

12/19/75 — Motion to dismiss filed.

1/21/76 — Oral motion to reduce bond granted. Bond reduced to $150,000 and jail notified.

6/16/76 — Motions to dismiss filed.

7/20/76 — June 16 motions to dismiss denied.

9/15/76 — Motion to dismiss filed.

9/15/76 — Petition for nolle filed.

9/30/76 — September 15 motion to dismiss and petition for nolle denied.

11/3/76 — Oral renewal of motions "to dismiss" and "petition to nolle" denied.

11/8/76 — List of jurors filed.

11/16/76 — Mistrial granted.

the commencement of the first trial. This lengthy delay triggers an inquiry into the other factors that go into the balance. *Barker* v. *Wingo,* supra, 530–31; *State* v. *Brown,* 172 Conn. 531, 536, 375 A.2d 1024, cert. denied, 434 U.S. 847, 98 S. Ct. 153, 54 L. Ed. 2d 114 (1977) ; *State* v. *L'Heureux,* supra, 319.

The state in its brief gives several reasons for the delay: (1) the crowded criminal docket; (2) the complex nature of the case; (3) the need to secure the testimony of Siretz, the young woman who actually fired the shots;[3] (4) the three changes in defense counsel; and (5) scheduling problems due to the fact that this was a jury trial and there were twenty-two witnesses.

In *Barker* v. *Wingo,* supra, 531, it was stated that a neutral reason such as an overcrowded docket should be weighed less heavily than a deliberate attempt to delay on the part of the state; but nevertheless, the delay, if for this reason, should be considered since the ultimate responsibility for such circumstances must rest with the state rather than with the defendant. See also *State* v. *Brown,* supra, 536–37. The claim of time spent negotiating with Siretz' counsel cannot be considered as there is nothing in the record to substantiate this claim. This is not to be construed as disbelief of the state's assertion in its brief, but rather as a necessary application of appellate procedure that claims made in briefs must be supported by the record. *Furber* v. *Administrator,* 164 Conn. 446, 451, 324 A.2d 254 (1973). However, what may be considered in evaluating a delay in prosecution and what the record

---

[3] The state claims that it had to negotiate through her counsel to effectuate a modus vivendi so that her testimony would be available at trial.

supports is the complex nature of the case. This was not an ordinary street crime. The state was not alleging that the defendant actually killed Victoria Stuart and wounded Donald Stuart, but was rather attempting to prove that the defendant, planning on insulating himself with his hospital alibi, induced Siretz, who was allegedly high on drugs, to pull the trigger. The evidence also revealed that conflicting statements were made by the actual perpetrator of the crimes. Under these circumstances, it was obvious that the state needed time to investigate and marshal its evidence.

"[T]he defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right." *Barker* v. *Wingo,* supra, 528. According to the record, the defendant first asserted his right to a speedy trial by motion on August 28, 1975, four and one-half months after his arrest. He reasserted this right on four separate occasions. The record contains no indication that, even though defense counsel was changed three different times, the defendant requested any continuances. Thus, no element of waiver operates to weaken the defendant's claim as far as the change of counsel is concerned. It is to be noted, however, that neither the record nor those portions of the transcript referred to indicate that the motions made had significant weight or were not purely pro forma objections. *Barker* v. *Wingo,* supra, 529.

The final factor in the balancing test is prejudice to the defendant. "Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. . . . [The United States Supreme] Court has

identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past." *Barker* v. *Wingo,* supra, 532. In some instances a delay may work some detriment to the defense of a criminal case, but the extreme remedy of dismissal cannot be granted for every delay. If the delay does not affect the testimony of the accused or of his witnesses, there is no prejudice in that regard. *United States* v. *Aberson,* 419 F.2d 820, 821 (2d Cir.), cert. denied, 397 U.S. 1066, 90 S. Ct. 1497, 25 L. Ed. 2d 687 (1970); *State* v. *Baker,* 164 Conn. 295, 297, 320 A.2d 801 (1973).

In the present case, the defendant claims he was prejudiced by the "oppressive" conditions he had to endure in jail, by the substantial delay itself, and by the inability of two key witnesses to remember "specifics" about the conversations the defendant and Jean Siretz had with them.

This court is not insensitive to the needs and feelings of criminal defendants. While the testimony adduced at the defendant's bail reduction hearing, however, does not paint a pretty picture of incarceration, it does not describe oppressive conditions that constitute prejudice per se. *Bell* v. *Wolfish,* 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). More importantly, this claim was not made until the eve of the second trial.

The defendant claims that two key witnesses could not recall the details of the conversation in which the defendant supposedly engineered the shootings. He contends that the witnesses used "they" because they could not remember specifically whether Siretz or the defendant said a particular thing. A fair reading of their testimony in the applicable sections of the transcript cited by the defendant leads to the conclusion that when one of the witnesses said "they," it was not because he or she could not remember who said what but because the witness was referring to both McCarthy and Siretz. The one or two instances where a witness could not remember something was a unique circumstance. Moreover, the defendant has failed to present any specific incidents of forgotten facts that were crucial to his case.

Further, an important consideration in this regard is the effect, if any, the delay had upon the defendant's memory or his ability to get witnesses in his behalf. Nowhere do the record or briefs indicate that the defendant's memory was dimmed as to his whereabouts or activities on the night and morning in question. The portions of the transcript referred to indicate that the defendant's memory was acute and definitive. The defendant makes no claim that he was unable to obtain any witnesses or any exculpatory evidence because of the delay.

In balancing the factors, it is clear that the length of the delay between the arrest and the trial was substantial. The defendant does not claim bad faith on the part of the state, but merely asserts that the delay is attributable to the state. The record supports this claim but it also supports the state's contention that the delay was not excessive or unreason-

able given the complexity of the case, the over-crowded docket and the need to obtain and marshal its evidence to be presented. See *Barker* v. *Wingo,* supra (five-year delay partially attributable to attempt to secure codefendant's testimony; both sides acquiesced in this delay for their own tactical reasons). The defendant asserted his right to a speedy trial from the very beginning. It should be noted, however, that, tactically, the best course of action was to press for an early trial and to try to foreclose the possibility of Siretz testifying before she was sentenced.[4] The defendant claims that his incarceration itself was prejudicial and that the delay caused memory lapses that interfered with his defense. We find that neither of these claims was substantiated. Although the case is a close one, the lack of any particular prejudice, coupled with the unintentional delay and the complex nature of the crimes charged, tip the scales to the state's side. The defendant was not deprived of his constitutional right to a speedy trial.

The defendant next assigns as error the court's denial of his petition of nolle. He argues that General Statutes § 54-90 (c) (Rev. to 1977) (now § 54-142a [c]) is applicable and requires the dismissal of the charges against him. The relevant language of the statute is: "Whenever any charge in a criminal case has been continued in the superior court . . . and a period of thirteen months has elapsed *since the granting* of such continuance during which period there has been no prosecution or other disposition of the matter, the charge shall be construed to have been nolled as of the date of termination of such thirteen-month period . . . ."

---

[4] Jean Siretz pleaded guilty and was sentenced on November 5, 1976.

(Emphasis added.) The defendant's case was not dormant for thirteen months or more. On the contrary, the case was being "prosecuted" during the thirteen month period from April 23, 1975, when the state requested a continuance, until the defendant petitioned for a nolle on September 15, 1976. A reading of the court entries as previously outlined in footnote 2 clearly indicates that several motions were filed and argued during this time span, including, inter alia, motions to dismiss, bills of particulars, motions for disclosure, a motion to quash, a bond review, motions addressed to the grand jury, and a motion for a speedy trial. Also, the defendant's case was on the trial list several times during this thirteen-month period. "The statute appears to be directed not to a situation such as this, but to circumstances in which the state obtains an initial continuance and then completely ignores the case for thirteen months." *State* v. *Troynack*, 174 Conn. 89, 95, 384 A.2d 326 (1977). The court was not in error in not entering a nolle on this statutory ground.

In his third assignment of error, the defendant contends that the trial court erred in charging the jury that the intent of the perpetrator of the crime was irrelevant and that the jury should disregard the allegations in the indictment and the information relating to the perpetrator's intent. The defendant's attack is two-pronged: first, he claims that the charge was erroneous because it amended the indictment and the information; and second, he contends that it was error as a matter of law for the court to charge that Siretz' intent was irrelevant.

In its charge, the trial court specifically instructed the jury to disregard the use of the word "intent"

as far as Siretz was concerned in both the indictment and the information.[5] The defendant attacks this portion of the charge on the grounds that it amounted to an unauthorized amendment to both the information and the indictment which substantively prejudiced the defendant in that all the essential elements contained in the information and the indictment were not included in the charge.

The short answer to the defendant's claim is that neither the indictment nor the information was amended: the court read to the jury verbatim the indictment returned by the grand jury and the information prepared by the state's attorney and the jury had the unaltered documents with them during their deliberations. *State* v. *Edwards,* 163 Conn. 527, 531–32, 316 A.2d 387 (1972).

The main thrust of the defendant's argument is that the court, by charging that Siretz' intent was irrelevant, excused the state from proving one of the essential elements of the crimes charged in contravention of *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). See *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975); *State* v. *Griffin,* 175 Conn. 155, 397 A.2d 89 (1978).

The defendant was charged as a principal with murder and attempted murder under § 53a-8 of the General Statutes. In the indictment, information

---

[5] In regard to the indictment, the court said: "You may disregard that word 'intent' as far as she is concerned. Her intent is not a necessary element. It is unnecessary. It is surplusage in the indictment." In regard to the information, the court charged: "Now again, you may disregard the word 'intent' as far as Miss Siretz is concerned. Because of Section 53a-9 it is not a necessary element for the State to prove under these circumstances. It is surplusage in the information."

and bill of particulars, the state alleged that the defendant "did intentionally aid one Jean Siretz, while the latter, with intent to cause the death[s] of [Donald and] one Victoria Stuart, did shoot and cause the death of said Victoria Stuart." Considerable testimony was adduced at the trial that Jean Siretz was so affected by drugs that she was incapable of forming any intent.

In its charge, the court instructed the jury that General Statutes § 53a-9[6] governed the situation and that "the mental state or intent of Miss Siretz is irrelevant." He went on to note that: "You may disregard that word 'intent' as far as she is concerned. Her intent is not a necessary element. . . . It is surplusage in the indictment."

While conceding that under *State* v. *Griffin,* supra, the state did not have to prove that Siretz had the capacity to formulate the intent necessary to convict her of murder, the defendant argues that Siretz' intent or lack thereof was relevant since under § 53a-8, as interpreted by *State* v. *Griffin,* supra, and *State* v. *Teart,* 170 Conn. 332, 336, 365 A.2d 1200 (1976), the state had to prove that the accessory had a criminality of intent and an unlawful purpose in common with the person or persons who actually committed the crime and that the accessory intentionally aided the intentional acts of the perpetrator

---

[6] "[General Statutes] Sec. 53a-9. LACK OF CRIMINAL RESPONSIBILITY; ABSENCE OF PROSECUTION OR CONVICTION NOT A DEFENSE. In any prosecution for an offense in which the criminal liability of the defendant is based upon the conduct of another person under section 53a-8 it shall not be a defense that: (1) Such other person is not guilty of the offense in question because of lack of criminal responsibility or legal capacity or awareness of the criminal nature of the conduct in question or of the defendant's criminal purpose or because of other factors precluding the mental state required for the commission of the offense in question . . . ."

of the crime. The defendant's argument is that unless the jury found that both the defendant and Siretz shared the common unlawful purpose that she go to the victims' apartment and shoot them (as opposed to the intent to cause death) then the defendant could not be found guilty of the crimes charged. The defendant has ranged far and wide in his argument on this point. He began his attack on the charge by claiming that the charge was erroneous in that Siretz' intent was an essential element and ended with the assertion that the court's failure to charge on a common unlawful purpose was the error. Despite the defendant's arguments, the issue presented is whether the charge was correct as to the law and whether it presented the case to the jury so that no injustice would result. *State* v. *Harris,* 172 Conn. 223, 226, 374 A.2d 203 (1977); *State* v. *Mullings,* 166 Conn. 268, 274–75, 348 A.2d 645 (1974). "In defining an offense, the trial judge should include every material element." 4 Wharton, Criminal Procedure (12th Ed.) § 540. The court's instructions on the offense charged must include every element of that offense. 75 Am. Jur. 2d, Trial § 713. In its charge, the trial court explained that General Statutes § 53a-9 governed the situation. The language of § 53a-9 (1) is plain and unambiguous and it states that lack of criminal responsibility or legal capacity or awareness of the criminal nature of the conduct involved on the part of the actual perpetrator of the offense is not a defense. The defendant has not attacked the constitutionality of that statute. Nor has he attacked its applicability to this particular situation. He merely ignores it and insists that *State* v. *Griffin,* supra, mandates that the perpetrator's intent is relevant. We find that his reliance on *Griffin* is misplaced.

The purpose behind § 53a-9 is to prevent the specific type of evil presented by this precise fact situation: A Mansonesque* figure using a mentally incompetent individual to commit a crime and going free because the actual perpetrator is incapable of the requisite intent. A crime may be performed though the actual perpetrator lacked the requisite mental capacity. *United States* v. *Bryan,* 483 F.2d 88 (3rd Cir. 1973); *United States* v. *Kelley,* 395 F.2d 727 (2d Cir.), cert. denied, 393 U.S. 963, 89 S. Ct. 391, 21 L. Ed. 2d 376 (1968). The principle was aptly stated in *United States* v. *Lester,* 363 F.2d 68, 73 (6th Cir. 1966): "It is but to quote the hornbook to say that in every crime there must exist a union or joint operation of act, or failure to act, and intent. However, this is far from suggesting that the essential element of criminal intent must always reside in the person who does the forbidden act. Indeed, the latter may act without any criminal intent whatever, while the *mens rea*—'willfulness' —may reside in a person wholly incapable of committing the forbidden act." The trial court's interpretation and application of § 53a-9 was correct. There was no error in instructing the jury that Siretz' intent was irrelevant.

The defendant's fourth claim of error is that the court erred in admitting a prior consistent statement of the state's principal witness, Jean Siretz, to rehabilitate her credibility. She testified for the state that she actually shot the Stuarts but that the defendant instructed her to do so. To impeach her credibility, the defense, during cross-examination,

---

* See *People* v. *Manson,* 71 Cal. App. 3d 1, 139 Cal. Rptr. 275 (1977); *People* v. *Manson,* 61 Cal. App. 3d 102, 132 Cal. Rptr. 265 (1976).

introduced two prior inconsistent statements that she gave to the police exculpating the defendant. Before her arrest on April 5, 1975, the day of the shooting, Siretz gave a signed and sworn statement to the police in which she stated that neither she nor the defendant was involved in the shootings. On April 6, 1975, after her arrest, in another sworn statement, she told the police that she had shot the victims, but that the defendant had had no involvement in or prior knowledge of the incident.

On redirect examination, when the state sought to offer into evidence, a third statement given on April 7, 1975, defense counsel objected to it on several grounds, among them that it was inadmissible hearsay because it was made subsequent to the prior inconsistent statements by which she was impeached. The court allowed the state to introduce the statement on the ground that prior consistent statements can be used to rehabilitate a witness' credibility, regardless of when the inconsistent statements were made.

The defendant urges us to adopt the rule that when the testimony of a witness is impeached by a prior inconsistent statement, the prior consistent statement, to be admissible, must have been made prior to the statements by which the witness was impeached or before there was inducement to make them because of pressure or personal interest. The annotation in 140 A.L.R. 21 and the supplementary annotations in 75 A.L.R.2d 909 in addition to the general observations in 81 Am. Jur. 2d, Witnesses §§ 648, 649, convincingly demonstrate the wide diversity of opinion upon the subject of testimonial rehabilitation by prior consistent statements.

The general rule is that "a party cannot strengthen the testimony of his own witness by showing that he has made previous statements to the same effect as his testimony . . . ." *Palmer* v. *Hartford Dredging Co.,* 73 Conn. 182, 188, 47 A. 125 (1900). "[This court] recognized in *Thomas* v. *Ganezer,* 137 Conn. 415, 78 A.2d 539 [(1951)], that prior consistent statements may be admitted in certain limited situations and that the determination of this issue is left to the discretion of the trial court." *State* v. *Mitchell,* 169 Conn. 161, 168, 362 A.2d 808 (1975). Under "appropriate circumstances," a prior statement, consistent with a witness' testimony, may be admitted after introduction of an inconsistent statement. *Mei* v. *Alterman Transport Lines, Inc.,* 159 Conn. 307, 317, 268 A.2d 639 (1970); *State* v. *Palm,* 123 Conn. 666, 677, 197 A. 168 (1938). There is an important qualification appended to this rule: " 'When a prior consistent statement is received . . . under the principle we have applied, it is admitted to affect credibility only, not to establish the truth of the statement.' " *State* v. *Mitchell,* supra, 168.

The third statement was consistent with Siretz' in-court testimony.[7] It was introduced to rehabilitate the witness, not to establish the truth of her prior in-court testimony. Moreover, the trial court, in its charge to the jury, made it clear that this third statement was admitted on the issue of credi-

---

[7] In her third statement, Siretz stated that she shot Donald and Victoria; that she wore gloves and later hid them; that for a week before the crime, the defendant had been telling her that he wanted Donald Stuart dead; that the defendant told her where they could get a gun; that the defendant thought that Donald Stuart had broken the windshield of his van; that the defendant was the one who asked Lawlor for the gun; that the defendant looked to see if the gun was loaded and asked her if she knew how to use it; that the defendant asked her if she knew what to do; that the defendant told her to

bility. On cross-examination, Siretz was questioned
in regard to her April 5 and 6 written and oral
statements.[8] Her veracity, quite correctly and pro-
fessionally, was challenged by defense counsel. It
is obvious that the cross-examination by the defense
had severely attacked Jean Siretz' credibility as a
witness and that the two statements made on April
5 and 6, 1975, contributed in no small measure to the
effectiveness of this cross-examination.

In the present case, the sequence of the statements
involved is unimportant. All three statements were
made less than forty-eight hours after the crime
occurred and more than twenty-one months prior
to her testimony at the trial. The first statement
was made before Siretz was arrested, when she
stated that neither she nor the defendant was
involved in the crime. The second statement was
made on the day she was arrested and after she had
been told that the defendant had implicated her. In

shoot Donald in the head; that the defendant told her that if
Victoria was there, that she would have to shoot her too so that she
could not identify her; that the defendant told her where to hide
the gun; that the defendant dropped her off in front of the Stuarts'
apartment and told her to meet him later in the van at the hospital;
and that after she told him about the shootings, he was real proud
of her and shook her hand.

[8] Defense counsel interrogated her about the inconsistent statements
which she allegedly made after April 5 and about her discussions
with the state's attorney's office, raising the inference that she had
fitted her testimony so suit the needs of the prosecution. She was
asked about the discussion she had had with her supervisor at the
Connecticut Correctional Institution, Niantic. She was questioned
extensively about the arrangement whereby she had pled to a man-
slaughter and an assault charge for shooting the Stuarts. Defense
counsel, through a series of questions, established her early parole
date. Implications were made that the state had prevailed upon
her to testify favorably to its interests. She was questioned about her
use of LSD.

that statement she admitted her guilt but denied any involvement on the part of the defendant. In the third statement, made the following day, she implicated both of them in the crime.

It is not unusual for an accused to make inconsistent statements concerning the innocence or guilt of himself or his accomplices prior to, at, and shortly after an arrest, especially when it becomes apparent that the authorities have learned of evidence implicating the accused and his accomplice.

All three statements are part and parcel of Siretz' utterances made at or near the time of arrest. There is no hint in the portion of the transcript referred to us by the defendant that any promise or arrangement was made with the state to induce a change of statement other than the interrogation commonly present at or near the time of arrest. It is true that between the first and second statements, she was told that the defendant had implicated her; however, she still made the second statement exonerating the defendant and implicating herself. There is nothing in the record or the portion of the transcript referred to us by the defendant to indicate any motive, bias or interest which occurred between the second and third statement that would taint it with revenge or self-interest.

As all of the statements may be considered as having been made at or about the same time, the issue of sequence is not critical. Requiring that the prior consistent statement be made before a prior inconsistent statement is " 'an unnecessary refinement.' " *United States* v. *Scholle,* 553 F.2d 1109, 1122 (8th Cir. 1977).

Under the rather unusual circumstances disclosed by this record, the trial court acted within its discretion in admitting Siretz' prior consistent statement, not as substantive evidence, but as evidence expressly limited to the issue of credibility.

This is not inconsistent with the recent holding in *State* v. *Dolphin*, 178 Conn. 564, 424 A.2d 266 (1979), where this court expanded the rule relating to prior consistent statements to allow their admission, not only to rehabilitate an inconsistent statement offered to rebut a witness' testimony, but also to admit them where the witness was impeached on the basis of bias, motive or interest so long as such consistent statement was made prior to the time when any motive, interest or bias arose.

The defendant's final claim of error is that the court erroneously admitted testimony that tended to show prior criminal misconduct on the part of the defendant. On direct examination, Siretz testified that she met the defendant in October of 1973, and that she saw him in Brooklyn, New York, a few days later. She was then asked when she next saw him and over objection and exception was allowed to answer that she saw him in the Brooklyn House of Detention for Men in Brooklyn, New York. Later, on direct, in explaining why she, and not the defendant, shot the Stuarts, she stated that she had asked the defendant, "Why can't you do it?" and he had replied, "I'm in enough trouble with New York." When she was asked what that response meant or referred to, upon objection, the jury was excused. On voir dire, she testified that the defendant had told her he had shot his wife. Defense counsel objected to the admission of this testimony on the grounds that: Siretz was incompetent to testify as

to the defendant's state of mind; that the probative value of the evidence of this crime was far outweighed by its prejudicial effect; and that the defendant's reason for not shooting the victims was irrelevant. The state argued that the testimony was admissible because it was relevant to Siretz' intent and that it related to her course of conduct. The court overruled the defendant's objection and admitted the evidence because it was probative of the defendant's intent, motive and lack of extreme emotional disturbance, and of the existence, if any, of a preconceived plan. Upon the return of the jury, Siretz was allowed to testify that the defendant had told her that he had shot his wife.

Criminal cases, by their very nature, are fertile ground for prior misconduct evidence. Thus, this court has repeatedly faced this issue and has laid down rather explicit rules for evaluating the admissibility of this type of evidence. "As a general proposition, evidence of guilt of other crimes, because of its prejudicial nature, is inadmissible to prove that a defendant is guilty of the crimes with which he is charged. *State* v. *Holliday,* 159 Conn. 169, 172, 268 A.2d 368 (1970) ; *State* v. *Harris,* 147 Conn. 589, 599, 164 A.2d 399 (1960). Such evidence is admissible for other purposes, however, such as when it is particularly probative in showing such things as intent, an element in the crime, identity, malice, motive or a system of criminal activity, to name some exceptions to the rule. *State* v. *Brown,* 169 Conn. 692, 701, 364 A.2d 186 (1975). The trial judge, however, must determine in the exercise of judicial discretion that its probative value outweighs its prejudicial tendency. *State* v. *Moynahan,* [164 Conn. 560, 597, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973) ] ; *State* v. *Hol-*

*liday,* supra, 173. Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. *State* v. *Hauck,* 172 Conn. 140, 144, 374 A.2d 150 (1976); *Thomas* v. *Thomas,* 159 Conn. 477, 480, 271 A.2d 62 (1970); 1 Wharton, Criminal Evidence (13th Ed.) § 241." *State* v. *Turcio,* 178 Conn. 116, 129, 422 A.2d 749 (1979).

The central issue in this trial was not whether the defendant actually pulled the trigger and shot the Stuarts, but whether he, exerting control over Jean Siretz, planned the shootings and aided and abetted her in committing them. To this end, evidence that the defendant was already "in trouble" for another shooting was highly relevant to establishing a motive for the reason why the defendant had Siretz carry out the act while he attempted to secure an alibi for himself. It also was relevant to establishing the existence of a preconceived plan, the existence of which was necessary to show a unity of purpose on the part of the defendant and Siretz.

There is no error.

In this opinion the other judges concurred.