STATE OF CONNECTICUT *v.* ADAM CARMON
(AC 16414)

Foti, Landau and Hennessy, Js.

814

Argued October 28, 1997—officially released March 3, 1998

*Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*James A. Killen*, assistant state's attorney, with whom, on the brief, was *Michael Dearington*, state's attorney, for the appellee (state).

*Opinion*

HENNESSY, J. The defendant, Adam Carmon, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes

§ 53a-54a, assault in the first degree in violation of General Statutes § 53a-59 (a) (1), and carrying a pistol without a permit in violation of General Statutes § 29-35. The defendant claims that the trial court improperly (1) precluded him from cross-examining a witness on the reliability of her identification of him, (2) admitted the statement of a key state witness called during the defendant's case for impeachment purposes, (3) refused to allow certain testimony by the police officer who had arrested one of the state's witnesses, and (4) instructed the jury to consider the information as evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the night of February 3, 1994, Charlene Troutman was in the living room of her apartment located on Orchard Street in New Haven waiting for a taxicab. With her, among others, was her seven-month old granddaughter. Shots fired from the street passed through the living room window killing the granddaughter and leaving Troutman permanently paralyzed. At the time the shots were fired, Jaime Stanley and Raymond Jones were stopped at a traffic light near Troutman's apartment and saw a man firing into the apartment. As the shooter ran away, both Stanley and Jones saw his face. Both witnesses identified the defendant during trial as the person who had fired the shots through the window of Troutman's apartment.

I

The defendant first claims that the trial court improperly precluded the defendant from cross-examining Stanley regarding the reliability of her identification of the defendant as the shooter, thereby denying him his federal and state constitutional right to confront the witnesses against him. In particular, the defendant

wanted to question Stanley about mistaken identifications that she may have made in the past.[1] The trial court held that evidence of possible misidentifications in the past, on unrelated events, was irrelevant to the issue of whether she had in fact seen the defendant on the night of the shooting. We agree.

"The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. *State* v. *Milum*, [197 Conn. 602, 608–609, 500 A.2d 555 (1985)]. The primary interest secured by confrontation is the right to cross-examination; *Douglas* v. *Alabama*, 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965) . . . ." (Internal quotation marks omitted.) *State* v. *Colton*, 227 Conn. 231, 248–49, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). "[This] constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which the jurors, as the sole triers of the facts and credibility, can appropriately draw inferences relating to the reliability of the witness." *State* v. *Dobson*, 221 Conn. 128, 137, 602 A.2d 977 (1992).

"One has the right to elicit any relevant fact that is contrary to the witness's direct testimony or to draw

---

[1] During the defendant's cross-examination of Stanley, the following exchange took place:

"[Defense Counsel]: Let me ask you a question. You ever see somebody, think you know him, walk right up to him, think you know him all along, get right up to him and say, 'Oh, gee, you are not the person I thought you were'?

"[State's Attorney]: Object.

"Q. You ever do that?

"[State's Attorney]: Object. Totally irrelevant. Has nothing to do with this case.

"The Court: Objection sustained.

"[Defense Counsel]: I'm going to claim that, Your Honor. I thought everybody has done that.

"The Court: I don't know that everybody has done that, [counsel]. There

attention to inconsistencies in his direct testimony.
. . . A witness can be impeached by proof that he has
made prior statements, either out-of-court or in a former
proceeding, that are inconsistent with his in-court testi-
mony. *Raffile* v. *Stamford Housewrecking, Inc.*, 168
Conn. 299, 362 A.2d 879 (1975) (pleadings); *Schurgast*
v. *Schumann*, 156 Conn. 471, 482, 242 A.2d 695 (1968);
*State* v. *Keating*, 151 Conn. 592, 597, 200 A.2d 724
(1964)." C. Tait & J. LaPlante, Connecticut Evidence
(2d Ed. 1988) §§ 7.24.2, 7.24.3, pp. 207–208.

The determination of whether a matter is relevant or
collateral, and the scope and extent of cross-examina-
tion of a witness, generally rests within the sound dis-
cretion of the trial court. See *State* v. *Miller*, 202 Conn.
463, 482, 522 A.2d 249 (1987); *State* v. *Ontra*, 178 Conn.
480, 488, 423 A.2d 134 (1979); *Todd* v. *Bradley*, 99 Conn.
307, 323–24, 122 A. 68 (1923). On appeal, the defendant
properly states that this discretion arises only after the
defendant has cross-examined the witness in a manner
that satisfies his constitutional protections. *State* v.
*Vitale*, 197 Conn. 396, 402, 497 A.2d 956 (1985); *State*
v. *Gaynor*, 182 Conn. 501, 508, 438 A.2d 749 (1980).

Furthermore, we do not disagree with the defendant's
assertion that "a defendant should be given sufficient
latitude on cross-examination to expose to the jury the
facts from which the jurors, as the sole triers of the
facts, can appropriately weigh the reliability of the in-
court [as well as the out-of-court] identification." *State*
v. *Milner*, 206 Conn. 512, 527–28, 539 A.2d 80 (1988).
We disagree, however, with his characterization of the
question he posed to the witness.

In this case, the defendant extensively cross-exam-
ined Stanley about her ability to identify, and the condi-
tions under which she identified, the defendant. Stanley

is no evidence that everybody has done that. There is an objection. I have
sustained the objection. Please just ask your next question."

testified that she was in a position that enabled her clearly to see the defendant. In particular, Stanley testified that she saw the defendant fire a gun, stop, turn and face her, return to his original position and fire through the window a second time. Stanley testified that she was focused on the defendant because of his actions.

Thereafter, the defendant posed a question to the witness that asked, in a very general way, if she had *ever* mistaken a person for someone else. That question was asked in the midst of extensive and detailed questioning and had no relevance to the circumstances surrounding the shooting and the subsequent identification of the defendant as the shooter.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. *Pitt* v. *Kent*, 149 Conn. 351, 357, 179 A.2d 626 (1962). One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. *State* v. *Blake*, 69 Conn. 64, 76, 36 A. 1019 (1897). No precise or universal test of relevancy, however, is possible, and the question must be answered in each case according to the dictates of logic and experience. *Plumb* v. *Curtis*, 66 Conn. 154, 166, 33 A. 998 (1895)." C. Tait & J. LaPlante, supra, § 8.1.1, p. 225.

We agree with the trial court that under the facts of this case, the fact that the witness may have incorrectly identified another person at some point in her life was irrelevant.[2] This information would not have tended to

---

[2] In an alternative argument, the defendant contends that the question was relevant to show "an inherent lack of identification or at least an inherent fallibility of identification" on the part of the witness. The court ruled that as part of the defendant's exploration of the reliability of this witness' identification of the defendant as the shooter, asking whether the witness had ever mistaken a person for someone else was not sufficiently

show that her identification of the defendant on the evening of the shooting was unreliable. Without more, this question was not relevant to her ability to identify the defendant on the evening of the shooting.

## II

The defendant next claims that the trial court improperly admitted into evidence the February 18, 1994 statement of Arthur Brantley[3] for impeachment purposes. The issue to be addressed is whether the statement Brantley made on February 18, 1994, was properly admitted as a prior consistent statement for the purpose of rehabilitating his credibility as a witness. The defendant presents two arguments in support of his assertion that the February 18 statement should not have been admitted: first, the statement should not have been admitted under the *Whelan* doctrine as a prior inconsistent statement because it was in fact consistent with his trial testimony and, second, the statement should not have been admitted for the purpose of rehabilitation as the statement was made after the prior inconsistent statements were made. To hold otherwise would violate the general rule that " 'a party cannot strengthen the testimony of his own witness by showing that he has made previous statements to the same effect as his testimony. . . .' " *State* v. *McCarthy*, 179 Conn. 1, 18, 425 A.2d 924 (1979). We agree that the statement should not have been admitted under *Whelan* and therefore do not reach his second argument. We find the error to be harmless, however, under the facts of this case.

Additional facts are necessary to our resolution of this claim. The day after the shooting, February 4, 1994,

analogous to render the question relevant. For the reasons set forth previously, we affirm the trial court's decision.

[3] Brantley went to Troutman's apartment the afternoon of the shooting to collect money owed to him by Troutman and her son, Richard, for drugs he had sold them. An altercation took place in connection with a dispute over the failure of the Troutmans to pay Brantley.

the police questioned Brantley because they had learned that Brantley had been involved in a heated argument with Troutman and other members of her family on the afternoon of the shooting. At that time, Brantley denied any involvement in or knowledge of the shooting. That statement was not made under oath. The next day, February 5, in response to police questions, he stated that after an altercation with the Troutmans on February 3, he went to Fair Haven to seek the aid of Anthony Little and to find a gun to get revenge for his treatment by the Troutmans. That statement was made under oath.

On February 7, Brantley told the police that on the evening of the shooting he, Anthony Little and Demetrious Bates drove to the Troutman residence with the intent to rob the Troutmans. While he and Little remained in the car, Bates went to Troutman's apartment window and fired several shots. Bates got back into the car and they drove away.

On February 18, Brantley told the police that the only truth to the statements he had given on February 5 and 7 was that he had gotten into a fight at the Troutman apartment. Brantley said that the altercation occurred when the Troutmans did not give him the money they owed him for drugs that he had sold to them previously.

At trial, the defendant called Brantley to the stand for the purposes of contesting the identification of the defendant as the shooter and presenting an alternative theory of liability. Once on the stand, however, Brantley testified that he was neither present at the shooting nor involved in any manner. Thereafter, the defendant was successful in having the court admit the two prior inconsistent statements given under oath by Brantley for substantive purposes under State v. Whelan, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct.

597, 93 L. Ed. 2d 598 (1986).[4]

Under cross-examination by the state, Brantley testified that the two statements he had given under oath were not true and the only true statement was the one given on February 18. On the basis of that testimony, the court admitted into evidence, ostensibly under the *Whelan* doctrine, the February 18 statement Brantley made to the police in which he denied any involvement in the shooting.

"As a general rule, a witness' prior consistent statements are inadmissible at trial. . . . Such statements clearly are barred by the hearsay rule if sought to be used to prove the truth of the matters asserted therein . . . also, they generally are prohibited even when offered for the limited purpose of rehabilitating the witness' damaged credibility. . . . The rationale upon which this rule is based is that the witness' story is not made more probable or more trustworthy by any number of repetitions of it. . . .

"This rule, however, is not absolute. The trial court, within its discretion, may admit a prior consistent statement if offered to rehabilitate a witness who has been impeached by a prior inconsistent statement . . . by the suggestion of bias, motive, or interest arising after the time the prior consistent statement was made . . . by a claim of recent fabrication . . . or by a claim of faulty memory. . . . When a prior consistent statement is admitted under any of these exceptions, it is admitted to affect credibility only and not to establish the truth of the statement." (Citations omitted; internal quotation marks omitted.) *State* v. *Valentine*, 240 Conn. 395, 412–13, 692 A.2d 727 (1997).

---

[4] *Whelan* stands for the proposition that a prior inconsistent statement may be used at trial for substantive as well as impeachment purposes where the statement is signed by a declarant who has personal knowledge of the facts stated therein and who testifies at trial and is subject to cross-examination.

The defendant claims that the statement given to the police by Brantley on February 18, two weeks after the last of the two *Whelan* statements were made, does not fall within the exception set forth in *Valentine*. In response, the state claims that although the statement made by Brantley on February 18 did not predate the earlier inconsistent statements given on February 5 and 7, it was given "about the same time" and, accordingly, should be admitted as an exception. See *State* v. *McCarthy*, supra, 179 Conn. 20.[5] At trial, the court admitted the defendant's February 18 statement that *Whelan* had "changed the rules" concerning the admissibility of prior consistent statements and instructed the jury that it was to consider the February 18 statement for impeachment purposes only, not for substantive purposes.

Although a prior consistent statement is admissible to rebut a suggestion of bias or interest, it "must be made at a time when the potential for bias or interest did not exist." *State* v. *Randolph*, 190 Conn. 576, 587, 462 A.2d 1011 (1983). Because Brantley's "consistent" statement was made several weeks after the two closely timed *Whelan* statements, we conclude that the trial court improperly admitted the February 18 statement under *Whelan* or *Valentine*. That does not, however, end our inquiry. The next question to be addressed is whether the admission of the statement was so harmful that the defendant must be afforded a new trial.

The defendant argues that admitting the statement was a harmful abuse of discretion. The defendant properly characterizes the admission of Brantley's February

[5] In *McCarthy*, the defendant made three statements within two or three days of each other. "There is nothing in the record or the portion of the transcript referred to us by the defendant to indicate any motive, bias or interest which occurred between the second and third statement that would taint it with revenge or self-interest. As all of the statements may be considered as having been made at or about the same time, the issue of sequence is not critical." *State* v. *McCarthy*, supra, 179 Conn. 20.

18 statement to show that Brantley had given various versions of his involvement in the shooting, thereby weakening his credibility as a witness. The *Whelan* statements were admitted, however, after Brantley had exhibited a tendency to make inconsistent statements.

The defense admits that it called Brantley to present evidence that someone other than the defendant had committed the crime. Accordingly, the defendant reasons that any evidence that tended to weaken Brantley's credibility as a witness would be detrimental to the defendant's case and therefore constitute reversible error. This argument fails.

Evidence of Brantley's tendency to make inconsistent statements regarding the Troutman shooting was first introduced to the jury by the defendant himself. The defendant's questioning of Brantley regarding his involvement prompted him to testify that he had given false statements on February 5 and 7. As a result of that testimony, the defendant was able to introduce those statements for substantive purposes. Likewise, the February 18 statement was introduced by the state to show that the witness' testimony, either live or taken from his sworn statements, was not trustworthy. Therefore, the February 18 statement can be characterized as additional evidence that Brantley's testimony was an accumulation of inconsistencies. Therefore, we conclude that admitting Brantley's February 18 statement was improper; however, it was not harmful under the facts of this case.

### III

The defendant next claims that the court improperly precluded him from presenting the testimony of a police officer regarding the location of drugs that were seized from the person of Jones. Jones, who testified as an eyewitness to the shooting, had been arrested and charged with possession of a firearm, possession of

narcotics with intent to sell and interfering with a peace officer. Jones testified that he had been charged with those offenses but denied his guilt. In order to impeach him, the defendant sought to introduce testimony through the arresting officer as to the circumstances of the arrest. The state's objection on relevance was sustained by the trial court.

On appeal, the defendant argues that the officer should have been allowed to testify to show that Jones had possessed a firearm and narcotics and that he had interfered with a peace officer, contrary to his testimony. The defendant argues that this evidence would have established Jones' lack of credibility. Furthermore, it would tend to show bias or interest in that due to the pending charges, he was motivated to be a favorable witness for the state and thereby fabricate his testimony.

The state contends that the proffered testimony had no relevance to the crimes charged against the defendant other than its potential to contradict Jones' testimony regarding the pending charges. The trial court ruled that the area of inquiry requested by the defendant concerned a collateral issue having little significance to the testimony of the witness or the issue in the case and should be excluded. We agree.

The determination of whether a matter is relevant or collateral rests within "the sound discretion of the court." *State* v. *Colton,* supra, 227 Conn. 248. Here, the defendant was allowed to cross-examine Jones about the arrest, the pending charges, and an incident wherein Jones and the defendant engaged in a physical confrontation concerning the sale of drugs in the neighborhood. We are not persuaded that the defendant's request to call the arresting officer to testify for the impeachment of Jones was appropriate.

The trial court did not abuse its discretion in finding that the defendant had been afforded sufficient latitude to impeach Jones and to attempt to show his bias, motive or interest for testifying in a manner favorable to the state's case.

## IV

The defendant next claims that the trial court failed to give a proper instruction to the jury when it omitted language that informed the jury that the information was merely a formal way of charging the defendant with a crime and that it was not evidence. The defendant argues that this omission was in fact an affirmative directive to the jury to consider the information as evidence. We disagree.

The defendant did not object to the instructions given by the trial judge to the jury nor did he file a written request to charge. Despite this, the defendant claims that this issue should be reviewed pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), or, in the alternative, under the plain error doctrine pursuant to Practice Book § 4061. The defendant contends that as a result of this omission, his constitutional right to the presumption of innocence was violated, and the state's burden to prove each element of the crimes charged beyond a reasonable doubt was lessened.

In support of his claim of a constitutional violation, the defendant relies on the case law of jurisdictions in which it is within the trial judge's discretion to give the information to the jury. These jurisdictions also require that the information be accompanied by a proper limiting instruction. The defendant claims that the omitted limiting instruction is critical because without it, the jury may improperly consider the information as evidence of the guilt of the accused.

We are not persuaded that the case law from other jurisdictions is applicable. Practice Book § 858 provides

in relevant part: "The judicial authority *shall* submit to the jury: (1) The information upon which the defendant was tried; and (2) All exhibits received in evidence. . . ." (Emphasis added.) Practice Book § 858 is not a discretionary rule. Therefore, case law from states in which submitting the information to the jury is a discretionary function is not persuasive.

In *State* v. *Hernandez*, 21 Conn. App. 235, 241, 573 A.2d 5 (1990), rev'd on other grounds, 218 Conn. 458, 590 A.2d 112 (1991), this court expressly rejected a claim similar to that of the defendant in the present case. In *Hernandez*, this court held that a defendant's claim that a jury would be misled into viewing the information as evidence of guilt, absent a contrary instruction, particularly where the jury was properly instructed on the presumption of innocence and the state's burden of proof, was not probable. We find that *Hernandez* controls this case.

Here, the instruction given to the jury was as follows: "You will have with you in the jury room the exhibits which are admitted into evidence. You will have with you the information which I read to you. As I have indicated, the exhibits are evidence just as much as the testimony from the mouths of the witnesses." The wording of the instruction to the jury did not state that the information was evidence, but rather that it would be with them in the jury room. This is required by the rules of practice. Furthermore, the trial court explicitly stated in its preliminary charge to the jury panel that the information "is not evidence of anything"; it was "merely a statement by the state's attorney of what they accused the defendant of doing." Although preliminary instructions to the jury panel cannot have the same efficacy as a final instruction to the jury, it must be recognized as having some impact on it. See *State* v. *Kelly*, 23 Conn. App. 160, 170, 580 A.2d 520, cert. denied,

216 Conn. 831, 583 A.2d 130 (1990), cert. denied, 499 U.S. 981, 111 S. Ct. 1635, 113 L. Ed. 2d 731 (1991).

We conclude that the failure of the trial court to include an affirmative statement that the information is not evidence in the final charge cannot be characterized as plain error because it is not so obvious " 'that it affects the fairness and integrity of and public confidence in the judicial proceedings.' " *State* v. *Vas*, 44 Conn. App. 70, 74, 687 A.2d 1295, cert. denied, 240 Conn. 910, 689 A.2d 474 (1997). We decline the defendant's invitation to review this claimed error under *Golding*[6] because the defendant has failed to demonstrate that, in light of *Hernandez*, a constitutional violation clearly exists and clearly deprived him of a fair trial. *State* v. *Golding*, supra, 213 Conn. 239–40.[7]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[6] "The first two conditions [of *Golding*] are determinations of whether a defendant's claim will be reviewed, and the third condition involves a review of the claim itself." *State* v. *Graham*, 33 Conn. App. 432, 442, 636 A.2d 852, cert. denied, 229 Conn. 906, 640 A.2d 117 (1994).

[7] Under the third prong of *Golding*, "a defendant may prevail on an unpreserved constitutional claim of instructional error only if, considering the substance of the charge rather than the form of what was said, it is reasonably possible that the jury was misled. . . . In determining whether the jury was misled, it is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case." (Citation omitted; internal quotation marks omitted.) *State* v. *Pearsall*, 44 Conn. App. 62, 68, 687 A.2d 1301, cert. denied, 240 Conn. 910, 689 A.2d 473 (1997). We conclude that the charge given by the trial court was legally correct and sufficient in presenting the case to the jury. The jury was repeatedly instructed on the requirements of the crime charged and that the state had the burden of proving every element beyond a reasonable doubt. The instructions, viewed in their entirety, gave the jury the proper guidance required under the law. See *State* v. *Vas*, supra, 44 Conn. App. 76.