STATE OF CONNECTICUT *v.* TERRY PORTEE
(AC 18432)

Landau, Schaller and Sullivan, Js.

Argued June 7—officially released November 2, 1999

*Lauren Weisfeld*, assistant public defender, for the appellant (defendant).

*Marjorie Allen Dauster*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*,

state's attorney, and *James G. Clark*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LANDAU, J. The defendant, Terry Portee, appeals[1] from the judgment of conviction, rendered after a jury trial, of murder as an accessory in violation of General Statutes §§ 53a-54a and 53a-8, attempt to commit murder in violation of General Statutes §§ 53a-8, 53a-54a and 53a-49 (a) (2), conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48, commission of a class A, B or C felony with a firearm in violation of General Statutes § 53-202k and illegal possession of a weapon in a motor vehicle in violation of General Statutes § 29-38.

On appeal, the defendant claims that the trial court improperly (1) admitted the victim's prior tape-recorded statement under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), (2) failed to conduct an adequate inquiry into allegations of juror misconduct, (3) charged the jury regarding consciousness of guilt and (4) instructed the jury on the concept of reasonable doubt. We affirm the judgment of the trial court in part and reverse it in part.

The jury reasonably could have found the following facts. On August 18, 1995, at approximately 1 a.m., the defendant, his brother, Dion Henry, and Michael Beverly,[2] drove to 74 Orchard Street in New Haven. The

---

[1] This appeal was taken originally to our Supreme Court. Pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c), our Supreme Court transferred the appeal to this court.

[2] Beverly stated that he was not involved in the shooting. He testified at trial that he never went to the backyard of the house on Orchard Street where the shooting took place, but rather walked across the street. Moments later, he heard shots fired and then the defendant ran by him. Thereafter, he learned that Nicole Moore, his child's mother, was one of the victims. Beverly pleaded guilty to a charge in connection with this incident and was serving a sentence at the time of trial.

defendant stated that if he saw Harry Carter, "it was on," which Beverly testified could have meant anything, including that if the men saw Carter they were going to shoot him. At this time, the defendant was in possession of a gun. Shortly thereafter, the defendant and Henry shot Carter as a result of a drug related dispute. During the shooting, Nicole Moore, who was accompanying Carter, was wounded. Carter survived, but Moore died from her injuries.

Later that day, the police arrested the defendant, who provided them with the following information in a signed statement. As a result of a drug dispute involving the defendant, Carter had shot at Henry on a prior occasion. In addition, two days before the shooting at issue, Carter and the defendant, who possessed an old, rusted .32 caliber gun, were involved in an altercation in which the defendant shot at Carter as Carter drove by and shot at Henry.

On August 18, 1995, shortly after 1 a.m., Henry picked up the defendant and told him that he had acquired a nine millimeter handgun to protect himself from Carter. The defendant and Henry then procured nine millimeter bullets for Henry's gun. At some point thereafter, while in pursuit of Carter, the defendant and Henry picked up Beverly and drove around until they parked on Orchard Street. While Beverly remained somewhere in front of 74 Orchard Street, the defendant and Henry proceeded to the backyard because the defendant knew that one of Carter's associates lived there. In going to this location, the defendant and Henry intended to make a statement on Henry's behalf so that he would be left alone. Henry did not care who he shot so long as it was one of Carter's associates.

From the street, the defendant could see the car that Carter had been in when Carter shot at the defendant and Henry two days earlier. The defendant assumed

that either Carter or the driver of the vehicle would be in the second floor apartment. The defendant and Henry waited in the backyard for someone to exit the apartment. At this point, Carter, Moore and a third individual walked up the driveway. The defendant, waiting in a corner in the backyard, saw Carter start to lift his shirt to reach for a gun. The defendant assumed that because Carter appeared to be reaching for a gun, Carter had noticed him. Last, the defendant indicated in his statement that because he felt trapped in the corner, he reacted by firing backward, reaching to the side and to the rear, as he ran out of the driveway.

Officer Robert Levy of the New Haven police department saw three people run out of the driveway. Levy secured Richard Masenberg, presumably the third person who accompanied Carter.[3] Masenberg informed Levy that the police should check an alley down the street from the scene of the crime. When the police did so, they found Henry. Further investigation led to the discovery of Henry's nine millimeter semiautomatic weapon and the defendant's coat, hat, gun and holster. Testing revealed that the two bullets recovered from Moore's body were fired from the defendant's weapon.

Following a verdict of guilty, the trial court sentenced the defendant to a total effective sentence of eighty years imprisonment. This appeal followed. Additional facts will be discussed where relevant to issues in this appeal.

I

Initially, the defendant claims that the trial court improperly admitted Carter's prior tape-recorded statement under *State* v. *Whelan*, supra, 200 Conn. 743. Specifically, the defendant claims that the court improperly

[3] It is unclear from the record whether Masenberg, whom Levy described as approximately thirteen or fourteen years old, and Richard Giles, whom Carter indicated in his November 7, 1995 statement to the police was the fifteen year old boy who accompanied him and Moore that morning, are

admitted the statement that Carter gave to the police on November 7, 1995, because (1) it was consistent with his in-court testimony and (2) he was not afforded his constitutional right to cross-examination.[4] We disagree.[5]

The following additional facts are necessary for our resolution of this claim. Detective Thomas O'Donnell of the New Haven police department interviewed Carter at Yale-New Haven Hospital on the day of the shooting. Carter informed O'Donnell that there were two people in the backyard close to the back door. A third person, wearing a mask, was near a parked car near the garage. The masked individual approached Carter, pointed a gun at him, but then moved the gun and instead shot at Moore.

On November 7, 1995, Carter gave a tape-recorded statement to O'Donnell in the presence of the prosecutor. Carter stated that on the morning of the shooting, at approximately 1:30 a.m., Carter, Moore and Richard Giles[6] were en route to Carter's car, which was parked

the same person. We assume for the purposes of this appeal that they are the same person.

[4] The defendant claims that the court improperly denied him his right to cross-examine an adverse witness in violation of the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut. The defendant has not claimed that the provisions of our state constitution afford him rights greater than those arising under the federal constitution. See *State* v. *Sullivan*, 244 Conn. 640, 646 n.6, 712 A.2d 919 (1998). We note, moreover, that "we interpret the confrontation clause of the Connecticut constitution in the same manner as its federal counterpart." *State* v. *Malone*, 40 Conn. App. 470, 476–77, 671 A.2d 1321, cert. denied, 237 Conn. 904, 674 A.2d 1332 (1996).

[5] The defendant also argues that the court improperly denied his motion to strike Carter's statement because of the absence of adequate cross-examination and because it was not a prior inconsistent statement. Because we conclude that the court did not abuse its discretion in admitting the statement under *Whelan* and did not infringe on the defendant's ability to cross-examine Carter, we need not separately address the denial of the motion to strike.

[6] See footnote 3.

in a backyard on Orchard Street. As they proceeded up the driveway toward the backyard, three men appeared and began to shoot at them. Against the light of the back porch, Carter recognized the defendant and Henry firing weapons. Carter did not recognize the third person because it was dark and the person was wearing a mask.

Carter denied that he reached into his shirt for his handgun at any time before the men began shooting. As Carter was telling Moore to run and attempting to push her, they were both hit by gunfire. Thereafter, Carter attempted to carry her to safety. The third person did not appear until Carter attempted to grab Moore. When the unidentified person started shooting, Moore was hit first and then Carter. As a result, Carter could no longer carry Moore and she slid to the ground.

After the three men ran through the backyard, Carter ran through the front to obtain aid. As Carter ran, he turned around and saw Henry about to jump over a fence and then turn back and run with the others. At this point, Carter took his Smith and Wesson nine millimeter handgun from his waist area and shot once in Henry's direction. Carter then walked across the street, threw his gun away and ran to get help. Shortly thereafter, he encountered Officer Joseph Foti of the New Haven police department. Foti attempted to help him, but Carter, who was more concerned about Moore, ran back to Orchard Street, where Moore's body was discovered, with Foti in pursuit.

At trial, the state called Carter as a witness. In response to the first question asked on direct examination, Carter stated: "I can't go through with this, man." Despite several similar protests, Carter confirmed that he was walking on Orchard Street on August 18, 1995, at 1:30 a.m. with Moore and his fifteen year old friend, Richard, to get to his car, which was parked in the

backyard of 74 Orchard Street. In response to questions regarding the walk up the driveway, Carter replied: "I refuse to answer any more questions, man." Out of the presence of the jury, the court informed Carter that if he refused to answer, he would be held in contempt. Because Carter continued to refuse to answer, the court found him in contempt and imposed a six month sentence to run consecutive to the sentence he then was serving. The state then inquired about the November 7, 1995 statement that Carter gave the police. Carter first indicated that he did not remember the statement and then refused to answer. The court found him in contempt and imposed a second six month sentence.

When the jury returned, Carter continued to refuse to answer questions about the August 18, 1995 shooting. Thereafter, in the jury's presence, the state marked Carter's tape-recorded statement for identification. After playing the introductory portion of the tape-recorded statement, Carter confirmed that it was his voice on the tape, that he gave the statement to O'Donnell and the prosecutor detailing what happened at 74 Orchard Street on August 18, 1995, and that the statement was true to the best of his knowledge.

Thereafter, the state proffered the tape recording under *Whelan* as a prior inconsistent statement. The defendant objected, stating that Carter had not listened to and adopted the entire statement, and that the defendant would not have any meaningful opportunity for cross-examination if Carter continued to refuse to answer questions. The court overruled the objection and ruled the statement admissible under *Whelan*. The state completed its direct examination by playing the tape-recorded statement for the jury. The defendant again confirmed that the statement was true, but refused to answer any additional questions.

On cross-examination, defense counsel attempted to question Carter, but he refused to answer regarding the

August 18, 1995 shooting, responding that he could not recall or invoking his fifth amendment privilege against self-incrimination. In response to additional questions, Carter denied that he had three prior felony convictions, but eventually admitted that he was currently incarcerated on a narcotics conviction. Carter also acknowledged that he was incarcerated for assault in the second degree with a firearm, which he claimed was based on mistaken identity, and that he was out of jail for one year before he knew he was on probation. Thereafter, defense counsel and Carter engaged in a colloquy regarding his statement to the police on August 18, 1995, whether he could read, and whether and when he dropped out of school. Although he refused to answer any further questions, Carter did testify that he could not remember telling O'Donnell at the hospital on August 18, 1995, that a third individual wearing a mask came out from near a car parked in the backyard of 74 Orchard Street and aimed first at Carter and then shot Moore.

Carter also indicated that his two month delay in providing a statement to the police was due to the fact that he was in a hospital or at home recovering from his injuries. Carter also addressed the length of his hospital stay, the severity of his injuries, the difficulty of recovery, his need for daily visits from a nurse and the fact that he could not remember the police officer that asked him questions at the hospital. Carter thereafter testified that he did not know if he had any felony charges pending against him when he made the November 7, 1995 statement. He then confirmed that he was charged with possession of narcotics, the charge for which he was then incarcerated after having been convicted about one month before he testified. In addition, Carter confirmed that he had misdemeanor charges of interfering with a police officer and failure to appear pending against him at the time that he gave the statement, charges that also were disposed of about one month before he testified.

Defense counsel then resumed questioning Carter about the tape-recorded statement. After Carter refused to answer a question regarding what Beverly was wearing on the day of the shooting, defense counsel moved that Carter be held in contempt, which the court denied.[7] Carter continued to refuse to answer questions concerning the shooting, namely, how far along the driveway he had gone before he saw the subjects in the driveway and whether he saw the defendant standing under the light in the backyard. Carter, who initially testified that he could not remember whether he had a gun, testified in response to defense counsel's questions that he did not have a gun and did not shoot at the defendant or Henry on August 16, 1995. Carter then continued to refuse to answer questions pertaining to the events of August 18, 1995.[8]

---

[7] The court stated the following: "The witness has already been held in contempt twice for refusing to answer questions that were asked of him by the state. I see no purpose in continuing to hold him in contempt . . . although it calls for contempt, I don't question that. But it seems to me it's a bit of an exercise in futility at this point with this witness."

[8] The following colloquy took place between defense counsel and Carter:

"Q. And you pulled your gun on him, when you saw him, didn't you, Mr. Carter?

"A. I had no gun.

\* \* \*

"The Court: Is your answer no, that you did not pull a gun on—

"A. I did not.

\* \* \*

"Q. You'd been having a dispute with my client, prior to August 18, 1995, didn't you—weren't you, Mr. Carter?

"A. No.

"Q. A couple of days earlier, you'd shot at my client, hadn't you, Mr. Carter?

"A. I'm humble. I don't shoot at nobody.

"Q. How about his brother, Dion Henry, Mr. Carter, you shot at him, too, didn't you?

"A. No. Where did you get that from?

"Q. August 16, two days before this incident, Mr. Carter—

"A. No.

"Q. You didn't shoot at Dion Henry?

"A. I didn't shoot at nobody.

"Q. That gun you had, Mr. Carter, that was your gun, wasn't it?

"A. I didn't have no gun.

Out of the presence of the jury, the defendant moved to strike Carter's testimony, which the court denied. The court ruled that "as difficult as it was . . . [to] cross-examine the witness, as it was to have direct examination of the witness, I think the—the defendant had as adequate an opportunity to cross-examine the witness as could be expected under all of the circumstances we had here with that witness." Thereafter, the court instructed the jury that if Carter's statements made at the hospital were inconsistent with his in-court testimony, it could consider that in assessing Carter's credibility. Furthermore, the court instructed the jury that Carter's tape-recorded statement could be used substantively and was not limited to impeachment.[9]

"Q. Well, you had a gun on August 18, 1995, didn't you, Mr. Carter?

"A. (No response.)

"Q. And you shot it in that alleyway, didn't you, Mr. Carter?

"A. I refuse to answer any of her questions.

"Q. You pulled it out and shot it, as soon as you saw my client standing under the light, isn't that right, Mr. Carter?

"A. (No response.)

"Q. Which way did you run, Mr. Carter, when you left the area of 74 Orchard Street?

"A. (No response.)

"The Court: Answer the question, Mr. Carter.

"A. Left.

"Q. You ran which way?

"A. Left.

"Q. Left out of 74 Orchard Street. And you told us, in your statement, you saw Dion Henry, he was going which way, Mr. Carter?

"A. (No response.)

"Q. Which way, Mr. Carter?

"A. I refuse to answer her questions, Your Honor.

"Q. Did you see which way [the defendant] went, Mr. Carter?

"A. (No response.)"

[9] The court issued the following instruction to the jury: "Now, during the course of the trial, the court admitted . . . [the] tape recording of [Carter's] statement to the New Haven police on November 7, 1995. That statement is admitted as substantive evidence of the information contained within it. This means that—that you can use the information contained in the statement as proof of any element of the crime, if you choose to credit what is stated in and on the tape recording. It is for you to decide whether some or all of the witness' statements to the police or some or all of his testimony

"Our standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there is an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . It is a well established principle of law that the trial court may exercise its discretion with regard to evidentiary rulings, and the trial court's rulings will not be disturbed on appellate review absent abuse of that discretion. . . . Sound discretion, by definition, means a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law . . . . And [it] requires a knowledge and understanding of the material circumstances surrounding the matter . . . . In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Orhan*, 52 Conn. App. 231, 237–38, 726 A.2d 629 (1999).

"*Whelan* stands for the proposition that a prior inconsistent statement may be used at trial for substantive as well as impeachment purposes where the statement is signed by a declarant who has personal knowledge of the facts stated therein and who testifies at trial and is subject to cross-examination." *State* v. *Carmon*, 47 Conn. App. 813, 821 n.4, 709 A.2d 7, cert. denied, 244 Conn. 918, 714 A.2d 7 (1998). To be admissible under the *Whelan* exception to the hearsay rule, "a prior inconsistent statement must have been given under circumstances ensuring its reliability and trustworthiness." *State* v. *Davis*, 32 Conn. App. 21, 38, 628 A.2d 11 (1993). "In a footnote, the [*Whelan*] court observed that prior tape recorded statements possess similar indicia of reliability and trustworthiness to allow their substantive admissibility as well." (Internal quotation marks omit-

in court is true. But you are permitted to use the facts contained within that taped statement as proof of the charges if you find that it is believable."

ted.) *State* v. *Wearing*, 46 Conn. App. 741, 752, 701 A.2d 41, cert. denied, 243 Conn. 937, 702 A.2d 645 (1997).

A

The defendant first claims that the trial court improperly admitted Carter's tape-recorded statement because it was consistent with his in-court testimony. Specifically, the defendant argues that there was nothing in Carter's tape-recorded statement that was inconsistent with his in-court testimony because Carter refused to testify. The court, therefore, abused its discretion because a pure refusal to testify does not supply the inconsistency that is a prerequisite for the admission of a statement pursuant to *Whelan*. We are not persuaded.

"A statement is admissible as a prior inconsistent statement . . . only when the trial court is persuaded that, taking the testimony of the witness as a whole, the statements are in fact inconsistent. . . . Such a determination as to inconsistency lies within the discretionary authority of the trial court." (Internal quotation marks omitted.) *State* v. *Bruno*, 236 Conn. 514, 554, 673 A.2d 1117 (1996). "Inconsistencies may be shown not only by contradictory statements but also by omissions. In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . and the same principle governs the case of the forgetful witness. . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. Thus, inconsistencies may be found in changes in position and they may also be found in denial of recollection. . . . The trial court has considerable discretion to determine whether evasive answers are inconsistent

with prior statements." (Citations omitted; internal quotation marks omitted.) *State* v. *Whelan,* supra, 200 Conn. 748–49 n.4.

In this case, Carter gave a tape-recorded statement to the police, but refused at trial to answer many questions regarding the shooting incident on August 18, 1995. Under *Whelan,* inconsistencies can be shown not only by express contradictory statements but by *omissions.* See id. Under the facts of this case, Carter, by refusing to testify and thereby omitting information, was no more available for cross-examination than was the witness in *Whelan* who was unable to recall specific details of a fight. Thus, the court properly could have concluded that there was " '[i]nconsistency in effect' "; id., 748 n.4; in that Carter who had volunteered a tape-recorded statement before trial, refused to supply answers at trial regarding that same statement. Accordingly, we conclude that the court did not abuse its discretion in admitting the statement as a prior inconsistent statement.

## B

The defendant also claims that the trial court improperly admitted the statement because he was denied his constitutional right to cross-examination.[10] We are not persuaded.

---

[10] The defendant claims that the inability to cross-examine Carter impinged his constitutional right to present a defense. Because the defendant has failed to brief this claim adequately, it is deemed to be abandoned. "[F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs." (Citation omitted; internal quotation marks omitted.) *New London Federal Savings Bank* v. *Tucciarone,* 48 Conn. App. 89, 100, 709 A.2d 14 (1998). In his brief, the defendant cites no law in support and provides no analysis of this claim. "[A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) Id., 101. We, therefore, will not review the claim.

"The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . However, [t]he [c]onfrontation [c]lause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Andrews*, 248 Conn. 1, 11–12, 726 A.2d 104 (1999).

"Although it is within the trial court's discretion to determine the extent of cross-examination . . . the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment." *State* v. *Colton*, 227 Conn. 231, 249, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). "The right of confrontation is preserved [however] if defense counsel is permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) Id. "In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions

that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Santiago*, 224 Conn. 325, 331, 618 A.2d 32 (1992).

While "[t]he denial of *all* meaningful cross-examination into a legitimate area of inquiry fails to comport with constitutional standards under the confrontation clause"; (emphasis added) *State* v. *Roma*, 199 Conn. 110, 116, 505 A.2d 717 (1986); that is not the situation in this case. Although Carter was uncooperative for the defense as well as for the state, a transcript of twenty-six pages of cross-examination shows that he answered several questions, although not all of the questions that the defense would have liked answered. This is not the situation where a witness did not testify at trial at all; see, e.g., *State* v. *Williams*, 231 Conn. 235, 248–49, 645 A.2d 999 (1994); or where the trial court completely precluded inquiry into a particular area. See, e.g., *State* v. *Santiago*, supra, 224 Conn. 332.[11]

Under the circumstances of this case, we conclude that the court did not infringe on the defendant's right to cross-examine Carter. The defendant argues that Carter refused to be cross-examined about the shooting, and about whether he had been arrested and charged with anything in connection with this case. The court, however, did not preclude questioning into any area that defense counsel found relevant to the defendant's case; it was Carter who refused to testify.

[11] The defendant relies on *State* v. *Altrui*, 188 Conn. 161, 170, 448 A.2d 837 (1982), for the proposition that when a defendant's cross-examination is restricted by the competing fifth amendment right of a witness, it may be necessary for a trial court to strike the direct testimony of that witness. This reliance, however, is misplaced. In *Altrui*, our Supreme Court held that this action by the trial court would be required when a witness' prior testimony results in testimonial waiver of the witness' fifth amendment privilege and the witness is subsequently recalled to the stand. Under the circumstances of this case, Carter was not previously called to the stand and did not engage in testimonial waiver. See id.

During questioning, defense counsel exposed facts to the jury from which it could draw inferences relating to Carter's reliability as a witness. See *State* v. *Colton*, supra, 227 Conn. 249. Specifically, Carter responded to questions about the statement he gave at the hospital on the morning of August 18, 1995, and about waiting until November 7, 1995, to provide a detailed statement to the police. Carter also testified that he was with Moore on the morning of August 18, 1995, at 74 Orchard Street, that he was not in possession of a gun on that morning and that he had not shot at the defendant and Henry on August 16, 1995. Furthermore, Carter indicated that there were charges pending against him when he made the November 7, 1995 statement and that those charges had been disposed of one month before he testified for the state. Moreover, in terms of the overall quality of the cross-examination, our review of the record leads us to conclude that defense counsel was not prevented from cross-examining Carter so as to challenge his credibility. As in *Whelan*, the jury in this case "had an adequate opportunity to observe and examine the demeanor of the witness, to hear the testimony and to assess his credibility." *State* v. *Whelan*, supra, 200 Conn. 755. We conclude, therefore, that the court did not infringe on the defendant's constitutional right to cross-examine Carter.[12]

---

[12] Even if we assume that the court improperly admitted Carter's prior tape-recorded statement under *Whelan*, we conclude that it was harmless error. The denial of a defendant's opportunity to impeach a witness for motive, bias and interest implicates the protection of the confrontation clause and, therefore, "[t]he correct inquiry for identifying harmless constitutional error is to ask whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result

## II

The defendant next claims that the trial court improperly failed to conduct an adequate inquiry into allegations of juror misconduct. The defendant claims that although the court conducted an inquiry, "it did not go far enough." We disagree.

The following additional facts are necessary for our resolution of this claim. Two days before his sentencing hearing, in July, 1997, the defendant filed a motion for inquiry into jury misconduct. The defendant alleged that Frederick Brantle, a correction officer at the Whalley Avenue correctional center in New Haven where the defendant was held during trial, had told the defendant that Brantle's father, Willie Williams, had served on the jury that had convicted the defendant. Brantle also informed the defendant that the juror discussed the case with him during the trial and prior to the commencement of deliberations. The defendant alleged that

---

of the trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Santiago*, supra, 224 Conn. 333.

On the basis of our review of the record, we conclude that the overall strength of the prosecution's case was strong. The jury heard the defendant's statement admitting that he shot at Carter and Moore. Furthermore, the defendant admitted that he and Henry were at 74 Orchard Street, essentially waiting in ambush with the intent to shoot either Carter or one of his associates. Forensic evidence revealed that the bullets from the defendant's gun killed Moore. and his fingerprints were found on that gun. Moreover, the state, in its closing argument, did not rely on Carter's testimony, but instead repeatedly told the jury to discard Carter's testimony. Specifically, the state told the jury there was sufficient evidence to prove the defendant's guilt, including the placement of the cartridge casings, which demonstrated that the defendant fired the gun as he moved forward from his hiding place, rather than as he ran away shooting backward. The state also argued that Levy and Beverly testified that the defendant ran out of the driveway and down Orchard Street, and not as the defendant stated that he fled through the backyard. Finally, we note that the state argued that the absence of any casings from Carter's gun at the scene indicated that Carter's statement was accurate about not shooting his gun until he was in the street, since the possibility existed that the casings could somehow have been lost due to passing traffic. Accordingly, we conclude that any error in admitting the statement was harmless beyond a reasonable doubt.

the evidence that might have reached the jury, and therefore prejudiced him, was that during his incarceration, he was involved in a fight with a cellmate, arrested, charged with assault and placed in segregation.

At the sentencing hearing, the court put on the record that trial counsel had a conference with the court in chambers. The court noted that defense counsel had represented that a defense investigator had spoken to Brantle since the drafting of the motion and that he corroborated that Williams was his stepfather, but made other statements that did not correspond to the allegations set forth in the motion. The court acknowledged that under State v. Brown, 235 Conn. 502, 525–26, 668 A.2d 1288 (1995) (en banc), some type of inquiry into the defendant's allegations was required, but it was unwilling to subpoena Williams or Brantle at that stage of the inquiry.

To persuade the court that further inquiry was needed, defense counsel submitted the investigator's affidavit. Because the investigator corroborated the defendant's allegations to some degree, the defendant requested a two week continuance to investigate. The state objected, arguing that the defendant waited two months to allege misconduct and had not presented any evidence to support the allegations. The state also noted that, as a matter of public policy, it would be improper to "subject jurors and their families to intrusive investigations," especially in a case where the defendant's statement was the only evidence offered and he declined to testify under oath about the matter. Because of the unusual situation in which a relative of a juror was a correction officer in the institution where the defendant was confined, the court granted the defendant a one week continuance to investigate and to supply testimony under oath in support of his juror

misconduct claim. The court then ordered the defendant not to subpoena Williams without approval by the court.

When court resumed, Brantle, summoned by subpoena, testified that he worked as a correction officer at the Whalley Avenue correctional center in New Haven and that he had contact with the defendant one day in early May, 1997, when he was assigned to videotape the defendant's transfer to segregation and again approximately one to two months later. During the intervening month, the defendant worked "relief," which means that, rather than working in a particular assignment, he could be assigned anywhere. Brantle stated that he did work segregation a few times at about the time that the defendant was on trial, but that he had no contact with the defendant during that time.

Brantle indicated that he became aware that Williams had been a juror in the defendant's case only after the trial. During a visit at Williams' home, Williams informed Brantle that he had been on jury duty and that the trial had been completed. Williams then asked Brantle if he knew the defendant, but did not seek any other information about the defendant. Brantle replied that he did not know the defendant, but that he could see where the defendant was being held. Williams indicated that he did not want to be on a jury and that was "about the extent of it, dealing with [the defendant]." Furthermore, Williams did not inform Brantle of the outcome of the trial, and Brantle did not provide Williams with any information pertaining to the defendant's history while he was incarcerated at the Whitney Avenue correctional center. When Brantle saw the defendant a second time, about one month or more after videotaping the defendant's transfer to segregation and after the visit with Williams, he told the defendant that Williams had been a member of the jury at the trial.[13]

[13] Brantle stated: "I said to him that my father—stepfather was on his jury and he didn't want to be on the jury because he told them I worked at

The defendant also subpoenaed Lieutenant Kurt Gallo of the department of correction, who brought to court the defendant's housing location records and Brantle's work records. The defendant was assigned to segregation, the "Foxtrot" unit, on May 6, 1997, and returned to the general population on May 22, 1997. Brantle's records disclosed that on May 5 through 7, 14 through 16, and 22, 1997, he was assigned to the Foxtrot unit. On May 15, 1997, in addition to working the midnight shift, Brantle worked the day shift at "Foxtrot 1," which generally means that he remained inside an enclosed circular monitoring station while "Foxtrot 2" escorted inmates from place to place. On all the other days mentioned previously, Brantle was assigned to the midnight shift, during which only one officer is assigned to Foxtrot as there is no inmate movement during those hours absent an emergency.

The defendant did not testify about any conversation that he allegedly had with Brantle, but instead moved to subpoena Williams. In support of his motion, the defendant argued that although Brantle testified that he had no further contact with the defendant for at least one month after the videotaped transfer, the records demonstrated that he was assigned to the defendant's housing unit for five days during the defendant's trial. The state objected on the grounds that there was still no evidence of juror misconduct. Because the records were inconsistent with Brantle's testimony in that they indicated that Brantle could have had more contact with the defendant than he acknowledged, the defendant argued that Brantle's credibility was in question and that the court should permit Williams to be subpoenaed.

The court found that even if Brantle had more exposure to the defendant than he disclosed, no evidence

Whalley, and he told the prosecutor and the attorney this but it didn't make a difference and that was the extent of it."

was offered to support the allegations, and Brantle's testimony was credible. The court found that "absolutely nothing" contradicted Brantle's testimony that he did not have any discussions with Williams regarding the case until after the jury had rendered a verdict.[14] In fact, defense counsel conceded that there was no evidence of contact between Brantle and Williams before the verdict. Accordingly, the court denied the defendant permission to subpoena Williams and denied his oral motion for a new trial.

"Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . [T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . It has long been the law of this state that jurors shall not converse with any person [who is] not a member of the jury, regarding the cause under consideration . . . . [These] rules are of vital importance to assure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment. . . .

"It is well established, however, that not every incident of juror misconduct requires a new trial. . . .

[14] The court stated: "I've heard absolutely no evidence of juror misconduct that would warrant bringing a juror in here to start questioning him about misconduct. There's got to be some basis, some contradiction of the correction officer with respect to whether he talked to his [step]father or not, some statements by the correction officer contradicting his testimony here in court, something to support subpoenaing a juror and I have heard absolutely nothing under oath. I see no reason to pursue this any further. I find no evidence of juror misconduct that would in any way support a motion for a new trial based on juror misconduct . . . ."

[D]ue process seeks to assure a defendant a fair trial, not a perfect one. . . . [T]he constitution does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. . . . The question is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. . . . The defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror. . . . We have previously held that, in cases where the trial court is directly implicated in juror misconduct, the state bears the burden of proving that misconduct was harmless error. . . . Where, however, the trial court was in no way responsible for the juror misconduct . . . we have repeatedly held that a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct. . . .

"Finally, [a]ppellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . [W]e have . . . accordingly confined our role to a determination of whether there has been an abuse of discretion. . . . Claims of juror misconduct fall within this rule of limited review." (Citations omitted; internal quotation marks omitted.) *State* v. *Rhodes*, 248 Conn. 39, 46–48, 726 A.2d 513 (1999).

The defendant states that if Brantle did inform Williams about his segregation, "[o]ne can only imagine what other things Brantle said." The court was not implicated in the defendant's charge of juror misconduct and, therefore, the defendant bore the burden of

proving misconduct as well as the burden of proving the prejudicial impact of that misconduct. See id., 47. In this case, the defendant failed to present any evidence from which the court could have inferred that the jury heard extrinsic evidence regarding the defendant's placement in segregation or that the court could have used as a basis to subpoena Williams. Rather, the defendant, who chose not to testify about the alleged statements that Brantle made to him, simply engages in speculation about information that Brantle could have told Williams. The defendant also did not present any evidence at trial about any conversation between Brantle and Williams prior to the verdict.

The court found Brantle's testimony credible. Our Supreme Court has "[recognized] that the trial judge . . . is in a superior position to evaluate the credibility of allegations of jury misconduct, whatever their source." (Citations omitted.) *State* v. *Brown*, supra, 235 Conn. 527–28. Moreover, a trial court may take into consideration the fact that after a jury verdict has been accepted, the state has a strong interest "in protecting the privacy and integrity of jury deliberations, [and] preventing juror harassment . . . ." Id., 531. Because the defendant failed to prove either misconduct or prejudice, we conclude that there was no abuse of discretion on the part of the court in denying the motion for a new trial on the basis of juror misconduct.[15] See *State*

[15] The defendant also argues that Williams did not tell the truth and, therefore, the court should have questioned him. Brantle testified that Williams told him that he informed "the prosecutor and the attorney [about their relationship] but it didn't make a difference . . . ." See footnote 13. The defendant argues that if Williams was untruthful, this indicates that he knew that he should have revealed his relationship with Brantle, and it also creates the possibility that Williams violated his oath when he failed to reveal that relationship.

Although the defendant did not raise this argument to the trial court, he seeks review of this claim under *State* v. *Golding*, 213 Conn 233, 239–40, 567 A.2d 823 (1989), and the plain error doctrine, Practice Book § 60-5, formerly § 4061. We conclude, however, that because the court did not abuse its discretion in denying the motion for a new trial on the basis of juror

v. *Small*, 242 Conn. 93, 113, 700 A.2d 617 (1997) (en banc).

## III

The defendant next claims that the trial court improperly charged the jury on consciousness of guilt.[16] We disagree.

The defendant's claim is unpreserved and he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[17] or the plain error doctrine. Prac-

misconduct and in refusing to allow the defendant to subpoena Williams, there is no need to address this claim.

[16] The court instructed the jury as follows: "Now, during . . . arguments, a reference was made to a concept known as consciousness of guilt. The law of our state recognizes a principle known as admission by conduct or consciousness of guilt. Certain conduct of a person may be considered by you to show a guilty knowledge or consciousness of guilt. When a person is on trial for a criminal offense or . . . offenses, it is proper to show his conduct subsequent to the alleged criminal offenses which may fairly have been influenced by that act. Flight, when unexplained, can indicate consciousness of guilt if the facts and the circumstances support it. Now, the state claims that the defendant fled from the scene of the crime and from [Officer Levy] immediately after the crime. If you find that the defendant did flee or did hide from the police or from others following the commission of the crimes alleged, you may find that such actions tend to show a guilty connection with the crime. In other words, any actions of the defendant subsequent to the alleged criminal act which you find show a guilty knowledge influenced by the criminal act itself may be used by you as circumstantial evidence of the defendant's guilt. That is, if you find that the defendant's acts or flight show a consciousness of guilt, you may use that conclusion as independent evidence of guilt, along with the other facts in the case, to determine whether or not he has been proven guilty of the crimes charged."

[17] "Under *Golding*, a defendant can prevail on an unpreserved claim of constitutional error only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." (Citations omitted; internal quotation marks omitted.) *State* v. *Otero*, 49 Conn. App. 459, 463 n.6, 715 A.2d 782, cert. denied, 247 Conn. 910, 719 A.2d 905 (1998).

tice Book § 60-5, formerly § 4061.[18] The defendant acknowledges, however, that our Supreme Court has upheld consciousness of guilt instructions; see *State* v. *Groomes*, 232 Conn. 455, 472–74, 656 A.2d 646 (1995); *State* v. *Freeney*, 229 Conn. 582, 594, 637 A.2d 1088 (1994); *State* v. *Wright*, 198 Conn. 273, 281, 502 A.2d 911 (1986); and held that such instructions are nonconstitutional in nature. *State* v. *Robinson*, 227 Conn. 711, 732, 631 A.2d 288 (1993); *State* v. *Smith*, 219 Conn. 160, 165–66, 592 A.2d 382 (1991); *State* v. *Merritt*, 36 Conn. App. 76, 96, 647 A.2d 1021 (1994), appeal dismissed, 233 Conn. 302, 659 A.2d 706 (1995). He now invites this court to reconsider the issue, not as an evidentiary claim, but instead as constitutional error. Moreover, the defendant invites this court to adopt a requirement under its supervisory authority barring consciousness of guilt instructions. We decline to accept either invitation.

We note that "[t]his court will not reexamine or reevaluate Supreme Court precedent. Whether a Supreme Court holding should be reevaluated and possibly discarded is not for this court to decide." (Internal quotation marks omitted.) *State* v. *Maia*, 48 Conn. App. 677, 683 n.8, 712 A.2d 956, cert. denied, 245 Conn. 918, 717 A.2d 236 (1998). Accordingly, we are guided in the resolution of this claim by *State* v. *Hines*, 243 Conn. 796, 709 A.2d 522 (1998). In *Hines*, our Supreme Court rejected the invitation to overrule precedent permitting such instructions. Id., 813–14. Regarding the defendant's request that we invoke our supervisory powers to promulgate a rule precluding jury instructions on consciousness of guilt, the *Hines* court declined to exercise its supervisory powers, noting that it did not "consider this an appropriate case for the exercise of [its]

---

[18] Practice Book § 60-5, formerly § 4061, provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

supervisory powers"; id., 814; since "[a] blanket rule governing flight instructions would not serve the narrow purpose that [its] supervisory powers are intended to further." Id., 815. Accordingly, we conclude that the defendant's claim is without merit.

IV

The defendant next claims that the trial court improperly instructed the jury on the concept of reasonable doubt. We disagree.

The defendant concedes that he submitted a request to charge that contained similar language and that no exception was taken to the instruction. He claims, however, that the claim is reviewable pursuant to *State* v. *Golding*, supra, 213 Conn. 233, or under the plain error doctrine. Practice Book § 60-5, formerly § 4061. The defendant acknowledges, however, that our Supreme Court has rejected similar claims. See *State* v. *Kelley*, 229 Conn. 557, 567–68, 643 A.2d 854 (1994); *State* v. *Smith*, 210 Conn. 132, 147–50, 554 A.2d 713 (1989). The defendant argues that these prior decisions were erroneous and invites this court to reconsider them. As stated in part III of this opinion, whether Supreme Court precedent should been evaluated and discarded is not for this court to decide. See *State* v. *Maia*, supra, 48 Conn. App. 683 n.8. Accordingly, the defendant's claim is without merit.

V

We next, sua sponte, vacate the defendant's conviction on the fourth count of the substitute information, alleging a violation of § 53-202k. Although neither party briefed the issue, because of the serious constitutional ramifications, we examine it under the plain error doctrine. Practice Book § 60-5, formerly § 4061.

"Our Supreme Court held in *State* v. *Dash*, 242 Conn. 143, 150, 698 A.2d 297 (1997), that § 53-202k is a sentence enhancement provision and not a separate crime.

We conclude that *Dash* governs this situation, and further discussion of our Supreme Court's clear holding would serve no useful purpose. Although the defendant's total effective sentence was proper, the judgment must be modified to reflect the fact that § 53-202k does not constitute a separate offense. Accordingly, the defendant is entitled to have his conviction under § 53-202k vacated." *State* v. *Harris*, 54 Conn. App. 18, 25–26, 734 A.2d 1027, cert. denied, 250 Conn. 925, 738 A.2d 660 (1999).

The judgment is reversed only as to the separate conviction under § 53-202k and the case is remanded with direction to vacate the defendant's conviction under § 53-202k and to resentence the defendant to a total effective sentence of eighty years. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.